******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* MAURICE B.*
## (AC 46775)

Bright, C. J., and Alvord and Keller, Js.

*Syllabus*

Convicted of, inter alia, the crime of sexual assault in the first degree, the defendant appealed. He claimed that the prosecutor engaged in certain improprieties during rebuttal closing argument that deprived him of a fair trial. *Held*:

The prosecutor's response to the defendant's investigative inadequacy defense was not improper, as this court was not persuaded that the prosecutor misstated the law or improperly appealed to the jurors' emotions, and the prosecutor's puzzle piece analogy was consistent with and tied to his proper argument that the state's flawed investigation did not raise a reasonable doubt of the defendant's guilt in light of the victim's testimony and the other evidence the state presented.

The prosecutor's remark that the jury was "given two diametrically opposed version[s] of events that [were] irreconcilable with each other" did not violate the rule set forth in *State* v. *Singh* (259 Conn. 693) because the prosecutor did not expressly argue that, to find the defendant not guilty, the jury was required to find that the victim had lied, and he did not make a direct connection between the defendant's acquittal and the victim's credibility.

The prosecutor's isolated reference to "lov[ing] [the] fact that" he could refer to the police officer who interviewed the victim as a "former officer" was not improper because it was ambiguous.

The prosecutor's statements that implied that there existed an undetectable substance that could have been added to the alcohol or marijuana consumed by the victim and the defendant to which the defendant could have built up an immunity was improper because there was no evidence in the record to support that inference.

---

* In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

Pursuant to the factors set forth in *State* v. *Williams* (204 Conn. 523), the single instance of prosecutorial impropriety did not deprive the defendant of a fair trial because it was not particularly egregious or pervasive, defense counsel did not object to it or request a curative instruction, the trial court's general jury instructions sufficiently addressed it to mitigate any harm, and the state's case was not so weak as to be overshadowed by it.

Argued September 10—officially released October 15, 2024

*Procedural History*

Substitute information charging the defendant with the crimes of sexual assault in the first degree and sexual assault in the third degree, brought to the Superior Court in the judicial district of New Haven, geographical area number twenty-three, and tried to the jury before *Vitale, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom were *Kelly E. Davis*, senior assistant state's attorney, and, on the brief, *John P. Doyle, Jr.*, state's attorney, and *Alexander Beck*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Maurice B., appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (4).[1] On appeal, the defendant

---

[1] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (4) engages in sexual intercourse with another person and such other person is mentally incapacitated to the extent that such other person is unable to consent to such sexual intercourse."

The defendant also was convicted of sexual assault in the third degree in violation of General Statutes (Rev. to 2017) § 53a-72a (a), which provides in relevant part: "A person is guilty of sexual assault in the third degree when such person . . . (2) engages in sexual intercourse with another person whom the actor knows to be related to him or her within any of the degrees of kindred specified in section 46b-21." We note that, although the

claims that the prosecutor committed prosecutorial impropriety and deprived him of a fair trial when the prosecutor made certain improper statements during the state's rebuttal closing argument. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant is the biological father of the victim. One day in May, 2017, the defendant invited the victim to a hotel in New Haven (hotel), where he was staying. The victim walked to the hotel and met with the defendant in his hotel room. The two shared a bottle of alcohol and marijuana blunts,[2] talked, and watched television. The victim "[did not] remember anything after that." While the victim was incapacitated, the defendant engaged in sexual intercourse with her. When the victim woke up, she was fully dressed, but her clothing was wet[3] in the area of her genitals and thighs. The victim gave birth to a child in February, 2018.[4] The results of genetic testing were consistent with the defendant being the father of the victim's child.

The defendant was charged with sexual assault in the first degree and sexual assault in the third degree.

defendant's appeal form lists a challenge to the judgment of conviction on the charge of sexual assault in the third degree, he has not briefed any challenge to that conviction and his request for relief seeks reversal of his conviction of sexual assault in the first degree only.

[2] "A blunt is a street term used to describe a cigar filled with marijuana, instead of tobacco, and smoked to ingest the drug." (Internal quotation marks omitted.) *State* v. *McCarthy*, 105 Conn. App. 596, 599 n.1, 939 A.2d 1195, cert. denied, 286 Conn. 913, 944 A.2d 983 (2008).

[3] The victim did not say that the wetness was semen or from sexual arousal. She also did not say that she had spilled water on herself or whether her underwear was wet.

[4] At the hospital, upon the birth of the victim's child in February, 2018, a paternity test revealed that her boyfriend was not the father of the child. After the victim applied for state assistance, additional paternity testing was performed on two men. Neither was identified as the father. The victim testified that the defendant was aware that she was having men tested for the paternity of the child and that the defendant acted like he was trying to help her find out who the child's father was.

A jury trial was held in March, 2023. The state presented the testimony of the victim; the victim's mother; Cherelle Carr, a detective employed by the New Haven Police Department; and Michael Morganti, a forensic science examiner employed by the Department of Emergency Services and Public Protection. The defense presented the testimony of Patrick Bengtson, who was a patrol officer with the New Haven Police Department.

The victim testified as to the following regarding her relationship with the defendant and the events leading up to the assault. The defendant had been in and out of her life growing up, and she began spending time with him regularly when she was sixteen or seventeen years old. She drank alcohol and smoked marijuana with the defendant on prior occasions. When she visited the defendant in his hotel room in May, 2017, she arrived at his room and the two smoked marijuana and drank alcohol together. The defendant had one blunt already rolled when she arrived, and then he rolled another blunt. They shared the alcohol and marijuana, passing the bottle and blunts back and forth.

The victim further testified to the following regarding her alcohol and marijuana use. She had a high tolerance for alcohol, and it usually made her feel energetic. As to marijuana, she smoked it frequently, and it also did not make her feel tired. Marijuana and alcohol never had caused her to pass out before. She did not think that the marijuana she smoked on the date of the incident smelled or tasted any different. Although she was aware that other drugs or substances could be added to a blunt, she did not believe there was anything else in the marijuana. She did not remember falling asleep before the assault, stating that the last thing she remembered was watching a debate on television before it "goes all black." It was nighttime when she woke up, and her clothes were wet in the area of her genitals and thighs. She left the hotel room to go to her aunt's

house. The victim testified that she did not have consensual sex with the defendant.

The victim testified that in December, 2018, ten months after she gave birth to her child, the defendant sent her a voice message using the Facebook Messenger application,[5] in which he stated that "he should get tested because he drugged me and raped me while I was sleeping one night I went to go see him" (Facebook voice message). The Facebook voice message was not played for, or shared with, anyone. The victim also exchanged Facebook text messages with the defendant, screenshots of which were provided to the police and subsequently introduced into evidence at trial.[6] In one text message, the defendant asked the victim, "[W]ho knows this?" She replied: "Nobody . . . you said don't tell nobody . . . ." The defendant responded: "Hell no don't. I'm trying to think too hard right now." In another text message, the defendant stated: "You can't say who it is do you not understand. You gotta say a dead homie or something. . . . Do you understand you can't. BIG trouble." Some of the victim's responses to the defendant included: "why did you do what you did" and "[y]ou should have never did it . . . why wouldn't I be mad at you . . . ."

The victim testified that she captured screenshots of the Facebook text messages and sent them to her brother, who then sent them to her mother. The victim testified that her mother, after receiving the screenshots of the Facebook text messages, drove with her friend

---

[5] The victim testified that she does not give her phone number out and instead regularly uses the Facebook Messenger application. Through the application, one can send text messages, make audio calls, videochat, and send voice messages. She communicated with the defendant using only the Facebook Messenger application.

[6] The victim testified at trial that a "little arrow," shown on one of the screenshots of the Facebook text messages, showed the "voice message that was sent." That screenshot was introduced into evidence as exhibit 5.

in a vehicle to pick the victim up. The victim testified that, while in the vehicle, the defendant made an audio call to the victim using the Facebook application and that the victim's mother began recording the conversation.[7] Two clips of the Facebook audio call were introduced into evidence.[8]

A few days after the Facebook audio call between the defendant and the victim, on December 24, 2018, the victim met with Bengtson, who performed an initial interview of the victim with the victim's mother and stepfather present. Bengtson explained that his initial interview responsibility was to get the foundation of the complaint before forwarding the complaint to detectives. When asked by defense counsel whether it would be a more valuable approach to interview a witness without others present, Bengtson agreed that it would be.

Carr was assigned to investigate the case and met with the victim on January 16, 2019. The victim sent Carr the screenshots of the Facebook text messages between herself and the defendant and gave Carr her Facebook account login information so that Carr could access the account.[9] A few months later, in May, 2019, Carr sought access to the victim's Facebook account but was not able to access it, as it had been deactivated. Carr did not seek a search warrant for the account.[10]

On March 26, 2019, the defendant met with Carr and told her that the victim had "[made] herself available"

---

[7] The victim's mother also testified that she recorded the conversation.

[8] In one clip of the Facebook audio call, the defendant refused to take a paternity test, stating that he did not want to go to jail.

[9] The victim also signed a consent form allowing Carr to search the Facebook account history between herself and the defendant.

[10] Carr testified that she did not get a search warrant because "once the [Facebook] page is deactivated, I knew that I wouldn't be able to see the other party's messages. So, if a person's page is deactivated, you can't see what they're saying to the other person any longer."

to have sex with him and that he had consensual sex with the victim at the hotel on multiple occasions, specifically, that the number was "in the teens." He told Carr that he did not believe that he could be the father of the victim's child because he either had used a condom or had withdrawn prior to ejaculation. Carr did not ask the defendant for consent, or apply for a warrant, to search his Facebook account history or cell phone. A video recording of Carr's interview of the defendant was introduced into evidence.

In February, 2023, the victim told Carr that she found an old phone that might have messages saved. Carr offered to drive her to the storage facility where the phone was located but the victim declined, saying that it was not her storage. On February 27, 2023, Carr went to the hotel and retrieved records of the defendant's stays there, one of which was from May 22 to May 23, 2017.

At the conclusion of the trial, the jury found the defendant guilty of both charges. On June 15, 2023, the trial court, *Vitale, J.*, sentenced the defendant to a total effective sentence of twenty-five years of incarceration, execution suspended after twenty years, two years of which was a mandatory minimum, followed by ten years of probation.[11] This appeal followed. Additional facts will be set forth as necessary.

We first set forth the relevant legal principles governing our review of the defendant's claim that the state violated his due process right to a fair trial when the prosecutor committed several improprieties during the state's rebuttal closing argument. "In analyzing claims

---

[11] On count one, the court sentenced the defendant to twenty years of incarceration, two years of which was a mandatory minimum. On count two, the court sentenced the defendant to five years of incarceration, execution fully suspended, to be served consecutively to the sentence on count one.

of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[O]ur determination of whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include: [1] the extent to which the [impropriety] was invited by defense conduct or argument . . . [2] the severity of the [impropriety] . . . [3] the frequency of the [impropriety] . . . [4] the centrality of the [impropriety] to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . and [6] the strength of the state's case. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . Under the *Williams* general due process standard, the defendant has the burden to show both that the prosecutor's conduct was improper and that it caused prejudice to his defense. . . . The two steps of [our] analysis are separate and distinct, and we may reject the claim if we conclude [that] the defendant has failed to establish either prong." (Citations omitted; internal quotation marks omitted.) *State* v. *Pernell*, 194 Conn. App. 394,

403–404, 221 A.3d 457, cert. denied, 334 Conn. 910, 221 A.3d 44 (2019).

Because the claimed prosecutorial improprieties occurred during rebuttal closing argument, we also set forth the following legal principles. "It is well established that prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however, counsel] must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence [on] jurors. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters [that] the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Courtney G.*, 339 Conn. 328, 341–42, 260 A.3d 1152 (2021).

Lastly, we note that defense counsel did not object to any of the remarks that form the basis of this appeal. "[O]ur Supreme Court has explained that a defendant's

failure to object at trial to each of the occurrences that he now raises as instances of prosecutorial impropriety, though relevant to our inquiry, is not fatal to review of his claims. . . . This does not mean, however, that the absence of an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. . . . To the contrary, we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time."[12] (Internal quotation marks omitted.) *State* v. *Ross*, 151 Conn. App. 687, 694–95, 95 A.3d 1208, cert. denied, 314 Conn. 926, 101 A.3d 271 (2014), and cert. denied, 314 Conn. 926, 101 A.3d 272 (2014). With these principles in mind, we proceed with our review of the defendant's claims.

## I

## PROSECUTORIAL IMPROPRIETY

## A

The defendant first contends that the prosecutor committed impropriety in responding to the defendant's investigative inadequacy defense during the state's rebuttal closing argument.[13] Specifically, he argues that the prosecutor both misstated the law and improperly appealed to the emotions of the jurors. Because the two claims are interrelated, we address them together and conclude that no impropriety occurred.

---

[12] "[U]nder settled law, a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) *State* v. *Courtney G.*, supra, 339 Conn. 340 n.4.

[13] We consider the instances of alleged impropriety in a different order from which the defendant briefed them.

The following additional procedural history is relevant. In his closing argument, defense counsel presented argument regarding the defendant's investigative inadequacy defense. He argued that the initial interview performed by Bengtson should not have been conducted with the victim's mother and stepfather present. He further argued that Carr's issues with respect to the Facebook accounts, including failing to timely review the victim's account to determine whether the voice message was available and failing to seek access to the defendant's account, caused a loss of information.

In the state's rebuttal argument, the prosecutor argued: "The New Haven Police Department absolutely did not do their job. Dropped the ball. So, my question to you, who pays the price for that? Where should that consequence fall? Does [the victim] take the hit for that or should the New Haven Police Department have to face what they did? We talked—and you heard [defense counsel] basically say, well, shouldn't [the victim have] preserved the evidence? She did. She gave it to the New Haven Police Department. Here it is. Access. Everything. Go. This is after, in December, she finds out for the first time that she's raising her sister. You know what, you handle it. She's got her own stuff to deal with. Right? She's got to process this world and, you know what, she gave her faith and she placed it in the New Haven Police Department, they let her down. No question. Does that make what she says up here any less reliable? That when she says no, I wouldn't have sex with my dad, that that makes that unreliable. And you think about this also. What kind of case is this? Is this a case where the police have to do an enormous amount of investigation to uncover the who, what, where, when, why. Was there scene analysis? [Were] there photographs that need to be developed? What kind of case was this? Or was this a case that [the victim] said this happened to me and the reasonable

and logical inferences that flow from that are that X, Y, and Z, the defendant sexually assaulted me because I would never willingly have sex with my father and the evidence supports that I was unconscious at the hands of that man. And, again, you have messages from that time period. You have the recordings. You have the Facebook messages. You have the tenor of the conversation that was going on when these other messages were happening. These are all pieces of a puzzle and I submit to you, you don't need every single piece of a puzzle to know what it is you're looking at. Very rarely in life do we have all the pieces of a puzzle before we are made to make decisions of important consequences. Correct? If a missing piece of [the puzzle was] somehow going to change what you thought was a waterfall into a horse, I don't know, but let me ask you. Are these missing pieces somehow going to change the fact that [the victim] consented to this?"

The court instructed the jury as to the defendant's investigative inadequacy defense as follows: "[Y]ou have heard some testimony of witnesses and arguments by counsel that the state did not adequately pursue a thorough investigation and that as a consequence, including by the lapse of time, relevant investigative leads or evidence were either lost or insufficiently developed. This is a factor that you may consider in deciding whether the state has met its burden of proof in this case because the defendant may rely on relevant deficiencies or lapses in the police investigation to raise reasonable doubt. Specifically, you may consider whether those alleged deficiencies or lapses would normally be taken under the circumstances, whether . . . if these actions were taken, they could reasonably have been expected to lead to significant evidence of the defendant's guilt or evidence creating a reasonable doubt of his guilt, and whether there are reasonable explanations for the omission of those actions. If you

find that any omissions in the investigation were significant and not reasonably explained, you may consider whether the omissions tend to affect the quality, reliability, or credibility of the evidence presented by the state to prove beyond a reasonable doubt that the defendant is guilty of the counts with which he is charged in the information. The ultimate issue for you to decide, however, is whether the state, in light of all the evidence before you, has proved beyond a reasonable doubt that the defendant is guilty of the crimes with which he is charged.''

The defendant first argues that the prosecutor misstated the law and improperly appealed to the jurors' emotions when he ''told the jury that finding reasonable doubt in an investigative inadequacy punishes the complainant and makes her pay the price or take the hit for the police failings.''

Our appellate courts recently have reaffirmed recognition of a defendant's entitlement to present an investigative inadequacy defense, explaining that ''[t]he inference that may be drawn from an inadequate police investigation is that the evidence at trial may be inadequate or unreliable because the police failed to conduct the scientific tests or to pursue leads that a reasonable police investigation would have conducted or investigated, and these tests or investigation reasonably may have led to significant evidence of the defendant's guilt or innocence. A jury may find a reasonable doubt if [it] conclude[s] that the investigation was careless, incomplete, or so focused on the defendant that it ignored leads that may have suggested other culprits.'' (Internal quotation marks omitted.) *State* v. *Prudhomme*, 210 Conn. App. 176, 188, 269 A.3d 917, cert. denied, 343 Conn. 902, 272 A.3d 198 (2022); see also *State* v. *Gomes*, 337 Conn. 826, 852–53, 256 A.3d 131 (2021).

We are not persuaded that the prosecutor, in making the challenged argument, misstated the law with

respect to the defendant's investigative inadequacy defense or improperly appealed to the jurors' emotions.[14] Considered in isolation, the statement relied on by the defendant could be construed as suggesting that the jury would be making the victim "pay the price" by finding the defendant not guilty if it determined that deficiencies in the police investigation raised reasonable doubt. When the statement is put into the context of the whole trial and rebuttal argument, however, the prosecutor's remarks instead suggest that any investigative inadequacies should not cause the jury to disbelieve the victim's account or to question her credibility. See *State* v. *Rivera*, 169 Conn. App. 343, 353, 150 A.3d 244 (2016) (reviewing challenged statement in context of entire trial and closing argument), cert. denied, 324 Conn. 905, 152 A.3d 544 (2017). As the state emphasizes in its appellate brief, the prosecutor immediately followed the challenged remark by asking the jury whether any investigative inadequacies made the victim's testimony any less reliable.

Finally, the defendant challenges the prosecutor's question whether the "missing piece of [the puzzle was] somehow going to change what you thought was a waterfall into a horse . . . ." The defendant contends that this remark "suggested that the jury could not find reasonable doubt based on the inadequate investigation unless the missing evidence would prove [the defendant's] innocence."

[14] "[A] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . No trial—civil or criminal—should be decided upon the basis of the jurors' emotions." (Internal quotation marks omitted.) *State* v. *Camacho*, 282 Conn. 328, 375–76, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007).

This court has held that the prosecutor's use of a missing puzzle piece argument does not constitute prosecutorial impropriety. See *State* v. *Henry D.*, 173 Conn. App. 265, 282, 163 A.3d 642, cert. denied, 326 Conn. 912, 166 A.3d 635 (2017). In *Henry D.*, the prosecutor stated in his rebuttal argument: "And as I alluded to earlier, listen to the court's instruction . . . that we . . . don't have to prove [the state's burden] beyond all . . . to a mathematical certainty or remove every single doubt from your mind. . . . And as I stated before and I can't state it enough, we have to prove the elements beyond a reasonable doubt and [defense counsel] threw a lot of things on this table right here, a lot of facts out here, some favorable for the state, some favorable for the defense. *Almost like a jigsaw puzzle putting it together. You bring this piece over here, you bring this piece over here, bring this piece over here and you don't need every single piece to put that jigsaw puzzle together. For argument sake, if it was a jigsaw puzzle of an elephant, if it came in and you had a piece of the trunk and you had a piece of the grey body, the . . . leg as well and there's still six or seven empty pieces over here, you don't need the whole puzzle to determine hey, that's a puzzle and the picture . . . in the puzzle is an elephant.* Again, that's in keeping with the burden that the state has." (Emphasis in original; internal quotation marks omitted.) Id., 279. The defendant claimed that the prosecutor's argument "diluted the state's burden of proof, creating a significant risk that the jury would convict the defendant on a standard less than reasonable doubt." (Internal quotation marks omitted.) Id., 279–80. In rejecting this claim, this court concluded: "Using the [puzzle] analogy, the prosecutor told the jury that it could conclude that the puzzle was a picture of an elephant when only a majority of the pieces were in place. This is representative of the accurate statement of law that the state was not required

to prove its case beyond *all* doubt." (Emphasis in original.) Id., 282–83.

In the present case, the prosecutor argued, as did the prosecutor in *Henry D.*, that "you don't need every single piece of a puzzle to know what it is you're looking at. Very rarely in life do we have all the pieces of a puzzle before we are made to make decisions of important consequences." He then asked the jury whether *the* missing piece of a puzzle would somehow change what they thought was a waterfall into a horse. The clear implication from this argument was that if every piece of the puzzle otherwise depicted a waterfall, a missing piece would not raise a reasonable doubt as to whether the completed puzzle would be a waterfall. The prosecutor's puzzle analogy in the present case, although less artfully drawn than that in *Henry D.*, was consistent with and tied to the prosecutor's proper argument that the state's flawed investigation did not raise a reasonable doubt of the defendant's guilt in light of the victim's testimony and the other evidence the state presented. We thus conclude that the prosecutor's puzzle piece analogy in the present case was not improper.[15]

B

Next, the defendant argues that the prosecutor improperly "argued, in effect, that the jury could only acquit [the defendant] if it concluded that [the victim] had lied." The defendant claims that the prosecutor violated the rule set forth in *State* v. *Singh*, 259 Conn. 693, 712, 793 A.2d 226 (2002). We do not agree.

During the state's rebuttal argument, the prosecutor argued: "[T]his is a case that is simple and it's simple because you are being—you are given two diametrically opposed version[s] of events that are irreconcilable

---

[15] We reiterate our caution in *State* v. *Henry D.*, supra, 173 Conn. App. 284, that "puzzle analogies should, in general, be used with great caution, as the risk for impropriety is significant."

with each other. You have been given a version of events from [the victim] as she sat here in front of you under oath and told you that she would not willingly or knowingly have sex with her father. . . . Opposed to that, standing right next to it, again, unable to be reconciled between those two is the fact that the defendant wants you to believe that [the victim] knowingly and willingly had sex with him. . . . It's either it was consensual or the daughter was not going to have sex with her father. Those are the two diametrically opposed version[s] of events that you have to reconcile."

"In *Singh*, [our Supreme Court] held that it is improper for a prosecutor essentially to argue during closing that, in order to find the defendant not guilty, the jury must find that witnesses had lied . . . . [Our Supreme Court] explained that [t]he reason for this restriction is that [t]his form of argument . . . involves a distortion of the government's burden of proof and preclude[s] the possibility that the witness' testimony conflicts with that of the defendant for a reason other than deceit. . . . [Our Supreme Court] later held, in *State* v. *Albino*, 312 Conn. 763, 97 A.3d 478 (2014), that, in closing argument, there is a distinction between characterizing a witness' testimony as a lie and characterizing it simply as wrong. [W]hen the prosecutor argues that the jury must conclude that one of two versions of directly conflicting testimony must be wrong, the state is leaving it to the jury to make that assessment [of the witness' veracity]. . . . [B]y framing the argument in such a manner, the jury is free to conclude that the conflict exists due to mistake (misperception or misrecollection) or deliberate fabrication. . . . Nonetheless, the mere use of the term wrong instead of lying will not always be proper if the prosecutor's closing arguments provid[e], *in essence*, that in order to find the defendant not guilty, the jury must find that witnesses had lied . . . ." (Citations omitted;

emphasis in original; internal quotation marks omitted.) *State* v. *Diaz*, 348 Conn. 750, 771–72, 311 A.3d 714 (2024).

We are not persuaded that the prosecutor's argument was improper under *Singh*. The prosecutor did not expressly argue that, in order to find the defendant not guilty, the jury must find that the victim lied. Rather, the prosecutor argued that the accounts by the defendant and the victim were "diametrically opposed version[s] of events that [the jury would] have to reconcile." In advancing that argument, the prosecutor did not expressly make a direct connection between the defendant's acquittal and the victim's credibility. As our Supreme Court stated in *State* v. *Albino*, supra, 312 Conn. 787, it is not "improper under *Singh* for a prosecutor simply to state in closing argument that, where there are two directly conflicting accounts of an incident, one must be wrong." We therefore conclude that the challenged remark was not improper.

C

The defendant next argues that the prosecutor improperly referred to Bengtson as a "former officer" when addressing the defendant's investigative inadequacy defense. The defendant argues that the prosecutor "implied that Bengtson was fired for the department's failures," when there was no evidence as to why Bengtson left the New Haven Police Department. The state responds that the remark was ambiguous and also "was simply an in-kind response to defense counsel's argument." We agree with the state.

The following additional procedural history is relevant. At trial, Bengtson testified that he was currently employed by Yale New Haven Hospital but previously was employed by the New Haven Police Department. There was no evidence presented regarding the reason Bengtson changed jobs. Bengtson testified that, on

December 24, 2018, he took the victim's initial complaint in the presence of the victim's mother and stepfather. When asked whether it would be "a more valuable approach to assure that there was no outside influence to interview a witness without others present," Bengtson agreed that it would.

During defense counsel's closing argument, counsel emphasized Bengtson's interview of the victim conducted with the victim's mother and stepfather present. He argued that "[f]ormer Officer Bengtson then agreed that doing so was against New Haven Police Department protocol." Additionally, he argued: "The New Haven Police Department protocol that former Officer Bengtson admitted to having violated in conducting that interview with [the victim's mother] and [stepfather] present makes absolute sense—that New Haven Police Department protocol makes absolute sense. It is, in other words, commonsense protocol. There's no reasonable explanation that exists for Officer Bengtson to not adhere to that New Haven Police Department protocol." In total, defense counsel referred to Bengtson as a former officer seven times during closing argument.

During the state's rebuttal argument, the prosecutor addressed the victim's testimony and then stated: "At the end of the day, when you take into consideration that the failure of the New Haven Police Department, and I love that fact that we can call him former Officer Bengtson, should not be held against what [the victim] told you here in court. When you take into consideration that [the victim] has nothing to gain from holding this baby out to the rest of the world as her sister, when you view the defendant's statement as just damage control, how do I escape from this as cleanly as possible, and you remember that that is the only statement that we have that this was in any way, shape, or form consensual, you are left with the commonsense conclusion

that there is only one way that this happened. That [the victim] did not seduce her father. That she did not willingly and knowingly carry his child to term. That the only reasonable and logical inference that makes sense is that the defendant took advantage of [the victim] while she lay unconscious after unwillingly ingesting what he gave her and then he engaged in illicit intercourse that resulted in the birth of that child.”

“Our Supreme Court has noted that, [w]hile the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider. . . . It also recognized that closing arguments of counsel . . . are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear.” (Citations omitted; internal quotation marks omitted.) *State* v. *Massaro*, 205 Conn. App. 687, 714–15, 258 A.3d 735 (2021), aff’d, 347 Conn. 200, 296 A.3d 782 (2023). “[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations. . . . We do not conclude that there was error simply because the meaning of an isolated statement was unclear.” (Citation omitted; internal quotation marks omitted.) *State* v. *Salazar*, 151 Conn. App. 463, 473, 93 A.3d 1192 (2014), cert. denied, 323 Conn. 914, 149 A.3d 496 (2016).

We conclude that the prosecutor’s isolated reference to “lov[ing] that fact that we can call him former Officer Bengtson” was ambiguous and, therefore, we cannot conclude that it was improper. See *State* v. *Schiller*, 115 Conn. App. 189, 196, 972 A.2d 272 (court could not conclude that remark was improper when meaning was

unclear), cert. denied, 293 Conn. 910, 978 A.2d 1113 (2009). Our conclusion that the remark was not improper is further buttressed by considering the sequence of the closing argument, in that defense counsel repeatedly referred to Bengtson as a "former officer." "[T]he state may properly respond to inferences raised by the defendant's closing argument." (Internal quotation marks omitted.) *State* v. *Pernell*, supra, 194 Conn. App. 410. Accordingly, we do not conclude that the prosecutor's remark was improper.

D

Finally, we address the defendant's argument that the prosecutor improperly introduced facts outside of the record when he used an anecdote to explain how the defendant and the victim could share the same bottle of alcohol and same blunts of marijuana with only the victim becoming incapacitated. We agree with the defendant that the challenged remark was improper.

The following additional procedural history is relevant. As noted previously, the victim testified at trial that the defendant had admitted in the Facebook voice message that "he drugged me and raped me while I was sleeping" when she went to see him. The victim testified to having a high tolerance for alcohol and smoking marijuana frequently and that these substances never had caused her to pass out before. She further testified that the marijuana she smoked on the date of the assault did not smell or taste any different. She testified that the defendant had one blunt already rolled when she arrived, and then he rolled another blunt.[16] She testified

---

[16] The following colloquy occurred on cross-examination between the prosecutor and the victim:

"Q. During your formal interview with Detective Carr, you indicated that . . . when you came to the hotel room you saw [the defendant] rolling the blunt?

"A. Yes.

"Q. Is that right? And in your interview with Detective Carr when she came to your house to do the buccal swab, you said the blunt was already rolled when you got there?

that she and the defendant shared the alcohol and marijuana, passing the bottle and blunts back and forth.

In closing argument, defense counsel argued: "[The victim] testified that she was familiar with the odor, the taste, and the smell of marijuana, yet, despite her high tolerance for marijuana and what she describes as her experience consuming alcohol, would have you believe that she became unconscious, but [the defendant] did not while they were consuming the same items."

During the state's rebuttal closing argument, the prosecutor argued: "And let's talk a little bit about the—about the marijuana in regards to was there one blunt, was there two blunts, who was rolling it. There is a great movie called 'The Princess Bride' if anybody has

"A. There was more than one.

"Q. There was more than one?

"A. Yes.

"Q. But you were smoking the same blunt, passing it back and forth?

"A. Yeah. It was more than one blunt that was rolled.

"Q. Okay. Okay. So you're saying that he had one rolled but he rolled—

"A. Yeah. He rolled another one—

"Q. When you were there?

"A. —in front of me.

"Q. Okay. . . . You never in all of your previous interviews, you never mentioned more than one blunt?

"A. They asked—I mean this happened in 2018. This is five years later. I can't remember everything."

During cross-examination, the following colloquy occurred between defense counsel and Carr:

"Q. And you recall [the victim] telling you that she felt, quote, like he took advantage of her, giving her drugs?

"A. Yes.

"Q. And [the victim] told you then that the blunt was already rolled up?

"A. Yes, she did.

"Q. And [the victim] also told you that normally [the victim], herself, would roll up weed?

"A. Yes, she did.

"Q. And [the victim] told you that she didn't know if he spiked the blunt or the liquor—

"A. Yes."

ever seen it. And there is a moment in that movie where there is a game of wits where two people are given two cups to drink from. One is poisoned and one is not. And one person has to decide which cup they're going to drink from and potentially die. One individual makes their decision and begins to laugh because he thought that he had outsmarted the other person. Then I switch the cup. You thought I was going to take this cup, but I drank from this cup and now you, my friend, are going to be sorry for the choice that I made and then that person then falls down dead. And when they're asked to explain how is it that you would even take this game, this 50—seemingly 50/50 chance and take that cup, the other person says, you know what I did, I poisoned both cups because, you know why, I have a tolerance for that poison. So, depending what's in that marijuana, if it's not just marijuana, if that other person has a tolerance for it that the other person doesn't share, one person's gonna go down, the other one's gonna stay up."

The defendant contends that the "anecdote introduced a fact outside the record—the notion of an undetectable drug which could be added to the shared alcohol and/or marijuana that would incapacitate [the victim] without affecting [the defendant]—which was never part of the state's evidence." Specifically, the defendant contends that the jury "might assume that a prosecutor would be familiar with the effects of 'date-rape' drugs and whether or not one can build a tolerance for them that would allow a culprit to safely share a drink or blunt with a victim." The state responds that the prosecutor's Princess Bride argument "offered the jury a reasonable and logical inference that did not invite speculation or depend on facts not in evidence." It maintains that "it was not so unreasonable as to be unjustifiable for the jury to infer that the defendant managed to somehow doctor the blunts and/or the alcohol in such a manner that caused [the victim] to lose

consciousness but left him sufficiently functional to engage in sexual intercourse with her before she regained consciousness." We conclude that the remark was improper.

"A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument. . . . [T]he state may [however] properly respond to inferences raised by the defendant's closing argument. . . . Furthermore, [a] prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Fasanelli*, 163 Conn. App. 170, 188–89, 133 A.3d 921 (2016). "The rationale for the rule prohibiting the state from making such a reference is to avoid giving the jury the impression that the state has private information, not introduced into evidence, bearing on the case." (Internal quotation marks omitted.) *State* v. *Billings*, 217 Conn. App. 1, 50, 287 A.3d 146 (2022), cert. denied, 346 Conn. 907, 288 A.3d 217 (2023).

We conclude that the prosecutor's argument improperly relied on facts not in evidence. See *State* v. *Crump*, 145 Conn. App. 749, 760–61, 75 A.3d 758 (prosecutor's comments that victim had not been required to undergo gynecological examination and that case would have gone forward regardless of whether she had agreed to examination improperly alluded to facts outside of record), cert. denied, 310 Conn. 947, 80 A.3d 906 (2013). The prosecutor's argument implied that there exists an undetectable substance that could be added to alcohol or marijuana, to which the defendant could have built up an immunity. There was no evidence introduced at

trial as to such a substance or any immunity of the defendant to such a substance. Because there was no evidence in the record upon which this inference could be based, the argument was improper.

## II

## DUE PROCESS

Having determined that the prosecutor's Princess Bride argument was improper, we now turn to an analysis of whether that single instance of prosecutorial impropriety deprived the defendant of a fair trial.

"The defendant bears the burden of demonstrating that, when considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process. . . . [O]ur determination of whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [supra, 204 Conn. 540], with due consideration of whether that [impropriety] was objected to at trial. . . . Those factors include the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . . Ultimately, [t]he issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Citations omitted; internal quotation marks omitted.) *State* v. *Courtney G.*, supra, 339 Conn. 361–62. We examine each factor and conclude that the prosecutor's argument in the present case did not impermissibly infringe on the defendant's due process rights such that he was deprived of a fair trial.

We first note that two of the factors weigh in favor of the defendant. First, the state concedes that the impropriety was not invited by the conduct or argument of defense counsel. Next, the improper argument was relevant to, although it did not directly address, a critical issue—whether the victim was incapacitated or the sexual intercourse was consensual. Thus, the notion, as the defendant describes it, that the victim "could be drugged with an imperceptible drug to which [the defendant] was immune," was related to one of the central issues in the case. See *State* v. *McCoy*, 331 Conn. 561, 573, 206 A.3d 725 (2019) (impropriety involved critical issue of credibility of state's key witness and, thus, factor weighed in favor of defendant). Accordingly, we conclude that this factor weighs in favor of the defendant.

Next, we turn to several factors that weigh in favor of the state. As to the severity of the impropriety, we must consider whether defense counsel objected to the improper argument, requested a curative instruction, or moved for a mistrial. See *State* v. *Felix R.*, 319 Conn. 1, 17, 124 A.3d 871 (2015) (presuming that counsel did not consider impropriety severe enough to merit objection where defense counsel failed to object to impropriety at trial). Defense counsel did not object to the improper argument, which "demonstrates that defense counsel presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." (Internal quotation marks omitted.) *State* v. *Courtney G.*, supra, 339 Conn. 362. Additionally, the prosecutor's impropriety was not pervasive. It was asserted only once and was confined to the prosecutor's rebuttal closing argument. See *State* v. *Felix R.*, supra, 17 (impropriety was not frequent when it consisted of single statement buried in lengthy closing argument).

As to curative measures, we reiterate that defense counsel did not object to the argument or request a curative instruction. Thus, the court provided no specific curative measures. "[I]n nearly all cases in which defense counsel fails to object to and request a specific curative instruction in response to a prosecutorial impropriety, especially an impropriety that we do not consider to be particularly egregious, and the court's general jury instruction addresses that impropriety, we have held that the court's general instruction cures the impropriety. . . . If, however, defense counsel fails to object to particularly egregious or pervasive [impropriety], and the general jury instructions do not specifically address the prosecutor's [impropriety], we have held that the general jury instructions were insufficient to cure the [impropriety], in spite of defense counsel's failure to object." (Citations omitted; footnote omitted.) *State* v. *A. M.*, 324 Conn. 190, 207–208, 152 A.3d 49 (2016). For the reasons previously stated in this opinion, the prosecutor's improper argument in the present case was not particularly egregious or pervasive. Consequently, we consider whether the court's general instructions sufficiently cured the impropriety. In the present case, the trial court instructed the jury that it was the sole finder of facts,[17] that the evidence from which it was to decide the facts consisted of the testimony of witnesses and exhibits received into evidence, and that the arguments and statements of counsel were not evidence to be considered.[18] Immediately before

---

[17] The court instructed the jury: "You are the sole judges of the facts. It is your duty to find the facts. . . . You are to recollect and weigh the evidence and form your own conclusions as to what the ultimate facts are and to determine where the truth lies. You may not go outside the evidence introduced in court to find the facts. This means that you may not resort to guesswork, conjecture, or suspicion, and you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy."

[18] The court instructed the jury: "The evidence from which you are to decide what the facts are [consist] of the sworn testimony of witnesses, both on direct and cross-examination, regardless of who called the witness; and, secondly, the exhibits that have been received into evidence. In reaching

closing arguments began, the court reinforced the difference between evidence and arguments of counsel by telling the jurors that the notebooks they used during the evidentiary portion of trial would not be available to them during closing arguments "because the arguments of counsel, as I told you, are not evidence . . . ." Thus, the trial court's general jury instructions sufficiently addressed the impropriety to mitigate any harm. See *State* v. *Payne*, 303 Conn. 538, 567, 34 A.3d 370 (2012) (trial court cured any harm by instructing jury that arguments of counsel were not evidence on which jurors could rely); *State* v. *Crump*, supra, 145 Conn. App. 762–64 (court's jury charge that arguments of counsel were not evidence adequately addressed prosecutor's improper remarks in closing arguments despite that single instance of impropriety was central to case and state's case was not particularly strong).

Finally, we consider the strength of the state's case. We conclude that the state's case was strong enough that the comment did not deprive the defendant of a fair trial. Although the central issue in the case was the comparative credibility of the defendant and the victim, the state presented evidence to support the victim's credibility. First, following the birth of the victim's child, the victim, consistent with her testimony that she was unaware at that time that the defendant had drugged her and assaulted her, identified other men as possible biological fathers of the child. Second, the defendant, in Facebook text messages, urged the victim to say that her child's father was "a dead homie" and

your verdict, you should consider all the testimony and exhibits received into evidence. Certain things are not evidence . . . and you may not consider them in deciding what the facts are. . . .

"These include arguments and statements by lawyers. The lawyers are not witnesses. What they have said in their closing arguments is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls."

told her that she cannot "say who it is" or it would be "BIG trouble." At the same time, the victim's messages to the defendant support her version of the events, including: "why did you do what you did" and "[y]ou should have never did it . . . why wouldn't I be mad at you . . . ." Although the Facebook voice message that the victim testified contained the defendant's admission to drugging her was not shared with anyone, there was evidence in the form of the "arrow" icon shown within the Facebook text messages on exhibit 5 that a voice message was sent by the defendant. Finally, there was evidence in the record that the victim, upon receiving the defendant's Facebook text messages, immediately provided the messages to her brother and her mother and also went to the police. The victim's account was buttressed by this evidence. In contrast, the defendant's account that the victim had "[made] herself available" to have sex with him and that he had consensual sex with her on multiple occasions, as shown to the jury through his statements to Carr, was unsupported by other evidence. "[W]e have never stated that the state's evidence must have been overwhelming in order to support a conclusion that prosecutorial [impropriety] did not deprive the defendant of a fair trial." (Internal quotation marks omitted.) *State* v. *Courtney G.*, supra, 339 Conn. 365–66. In the present case, we conclude that the state's case was "not so weak as to be overshadowed" by the impropriety. (Internal quotation marks omitted.) Id., 366.

Accordingly, because, on balance, the *Williams* factors weigh in favor of the state, we conclude that the prosecutorial impropriety in the present case did not deprive the defendant of a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.