******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.* ANTWON B.*
## (AC 48494)

Elgo, Wilson and Bishop, Js.

### *Syllabus*

Convicted of the crimes of manslaughter in the first degree with a firearm, attempt to commit assault in the first degree and larceny in the third degree, the defendant appealed. The defendant's conviction arose from an incident in which he shot the victim forty-two times and attempted to shoot his former girlfriend, L, in the face. After the shooting, the defendant drove his vehicle to his place of employment, an offsite airport parking lot, and took a vehicle owned by S, which he eventually drove to a police station and turned himself in. At trial, L testified that, after firing many bullets at the victim, the defendant put a gun to her face and pulled the trigger, but nothing happened, and that the defendant subsequently reloaded the gun and put it back in her face but thereafter shot the victim again and not her. The defendant claimed, inter alia, that there was insufficient evidence to convict him of attempt to commit assault in the first degree with a firearm and larceny in the third degree. *Held*:

There was sufficient evidence to support the defendant's conviction of attempt to commit assault in the first degree with a firearm, as the jury was free to credit L's testimony that the defendant pulled the trigger the first time he put the gun to her face and reasonably could have inferred from this evidence that the defendant intended to shoot L and cause her serious physical injury.

There was sufficient evidence from which the jury could find beyond a reasonable doubt that the defendant was guilty of larceny in the third degree, as the evidence established that S did not know the defendant and was out-of-state at the time the defendant took his vehicle and, thus, the jury reasonably could conclude that the defendant's taking occurred without S's knowing consent and in the course of his flight from the scene of the shooting, and, although the defendant eventually drove S's vehicle to a police station and left it there, at the time he took the vehicle, it was with the intent to retain it permanently.

This court concluded that, although certain questions the prosecutor posed while cross-examining the defendant were improper, that the prosecutor

---

* In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

improperly made use of the defendant's responses to those questions during his rebuttal argument, and that the prosecutor improperly relied on facts not in evidence during his closing argument, these improprieties, under the circumstances of this case, did not deprive the defendant of a fair trial, as these improprieties were minor and unimpactful and did not implicate the fairness of the trial.

The defendant could not prevail on his claim that the prosecutor's statements made during his opening and rebuttal closing arguments, which made use of the terms "we" and "us" to align himself with the jury, were improper, as the prosecutor's use of the first person was limited and the jury was properly instructed as to its exclusive role as fact finder.

Argued April 15—officially released November 25, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of murder, attempt to commit assault in the first degree with a firearm and larceny in the third degree, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Gustafson, J.*; verdict and judgment of guilty of manslaughter in the first degree with a firearm, attempt to commit assault in the first degree, and larceny in the third degree, from which the defendant appealed. *Affirmed.*

*Kevin M. Black, Jr.*, assigned counsel, for the appellant (defendant).

*Timothy F. Costello*, supervisory assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, *Linda F. Rubertone*, former senior assistant state's attorney, and *Jesse Giddings*, former supervisory assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Antwon B., appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 and 53a-59 (a) (1)

and larceny in the third degree in violation of General Statutes (Rev. to 2019) § 53a-124 (a) (1). On appeal, the defendant claims that (1) there was insufficient evidence to prove that he had committed the crimes of attempt to commit assault in the first degree and larceny in the third degree, and (2) prosecutorial impropriety deprived him of a fair trial. We affirm the judgment of conviction.[1]

The following facts, which reasonably could have been found by the jury, and procedural history are relevant to our review of the defendant's claims on appeal. On October 22, 2019, the defendant shot Leroy Jefferson[2] forty-one times with a Glock Gen 4 nine millimeter semiautomatic pistol (Glock), killing him. At the time, Jefferson was descending a flight of stairs with L, the defendant's former live-in girlfriend.

The defendant and L had known each other for approximately ten years prior to the shooting, and they had been involved in a romantic relationship for most of that time. They had a son together, who was born about one year after they met. When their son was two or three years old, L, L's daughter from a previous relationship and the couple's son moved into an apartment the defendant shared with his daughter in Windsor Locks. The couple experienced problems on and off throughout their relationship and they eventually broke up in 2019.

L and the defendant were not speaking with one another at all immediately after they broke up, and she moved out of the apartment. On June 1, 2019, L moved,

---

[1] The defendant also was convicted of manslaughter in the first degree with a firearm, by reason of extreme emotional disturbance, in violation of General Statutes § 53a-55a. He has not challenged his conviction of that offense in this appeal.

[2] Jefferson is referred to as both "Leroy Jefferson" and "Leroy Jefferson, Jr.," in the record. For simplicity's sake, we refer to him as Jefferson throughout this opinion.

with her daughter and the couple's son, into another apartment in the same building, "right down the hall" from the defendant's apartment. Eventually, L and the defendant resumed contact and by early October, 2019, they were having daily communications by phone, text message, and in person. From L's perspective, they were coparenting, but they were not together. L had been in a romantic relationship with Jefferson for approximately two to three months leading up to the October 22, 2019 shooting. From the defendant's perspective, however, once he and L "started back talking . . . everything went back to . . . normal." He and L were having dinner together and hanging out with the kids and, in his words, "[i]t was regular again." The defendant was not aware that L was seeing anyone else and he expected that he and L were "going to get back together and basically start our family all over and get married . . . ." L was aware, in early October, 2019, that the defendant "wanted to fix [their] family."

On October 22, 2019, after working an 11 p.m. to 7 a.m. shift as a security guard at Roncari Parking (Roncari) on Schoephoester Road in Windsor Locks,[3] the defendant texted L to ask if he could stop by her apartment to see their son before he left for school. L agreed, and the defendant proceeded to her apartment where he visited with L and their son. After seeing their son off to school, the defendant left L's apartment and went down the hall to his own apartment to rest.

After the defendant left her apartment, L received a text from Jefferson, made him some breakfast, and drove to Windsor to pick him up. Jefferson ate his breakfast in L's car. Because the "place where [Jefferson] was staying didn't have running water," L and Jefferson decided to go back to her apartment so he

---

[3] Roncari, now known as The Parking Spot, is located across the street from Bradley International Airport.

could shower. It was the first time that Jefferson had ever been to L's apartment. After Jefferson showered, he and L left L's apartment, where they had been for about forty-five minutes to one hour. They walked through the hallway to a stairwell that led down to the parking lot where L had parked her car.

In the meantime, the defendant had awoken from his nap and decided to go to the shooting range. The defendant had been licensed to carry firearms for more than fifteen years, and he went to the shooting range on a regular basis. He had taken L with him to the shooting range on a couple of prior occasions.

In preparation for his trip to the shooting range, the defendant left his apartment and went downstairs to the garage. He retrieved from the garage a gun and a bag containing magazines that were loaded with ammunition[4] and then proceeded to head back upstairs to his apartment to get another gun to bring with him to the range. When the defendant reached the door at the top of the stairwell and placed his hand on the doorknob to open the door, he felt resistance from the other side. At the same time, L, who was on the other side of the door with Jefferson, felt a "tug" as she tried to open the door to head down to the parking lot.

When the door opened, the defendant and L came face to face. L looked at the defendant "like, oh shit. I'm caught," but she "kept proceeding down the stairs" after Jefferson, who had gone first. In the defendant's words, he "was just . . . stuck. [He was] holding a door that's stuck" and "the guy," whom the defendant had never seen before, turned and said "[W]hat's up?" When L looked back at the defendant, he was just staring and holding the door until he said, "[F]uck this, or

---

[4] The state's firearm expert, Jill Therriault, testified at trial that a magazine is "kind of like a box" that holds live ammunition and is "put into the grip of the firearm" in order to fire the gun.

fuck that," pulled a gun from his waistband and started shooting at Jefferson as he was trying to exit the door at the bottom of the stairwell. The defendant was descending the stairs while he was shooting, and a couple of shots were fired in the stairwell before he reached the door at the bottom of the stairwell and continued shooting the victim in the parking lot.

During the course of these events, the defendant grabbed L and held onto her by her hoodie while he continued to shoot Jefferson. At some point, the defendant stopped and he put the gun to L's face and pulled the trigger, "but nothing happened." L knew the defendant had pulled the trigger because she heard a "click sound." She did not know, however, why the gun did not fire.

The defendant then reloaded the gun and put it back in L's face, at which point she asked, "[W]hat about our son?" The defendant then turned the gun back on Jefferson and shot him several more times as he lay on the ground in the parking lot. Although the defendant remembered hearing six shots in the stairwell, he did not remember shooting Jefferson or much about the shooting incident itself, with the exception of L asking him about their son.

After the defendant stopped shooting the second time, he told L she was "coming with him" and to give him her keys, but she refused. He then let L go, ran across the parking lot to his vehicle, a green Nissan Pathfinder, and drove away from the scene to Roncari. The defendant drove away from the Roncari lot in a blue Ford Explorer. It was determined later that the blue Ford Explorer belonged to Brad Shavrek, who had left the vehicle with Roncari, at its lot, while he traveled to Florida. Shavrek did not know the defendant.

While driving, the defendant phoned his sister and told her that he had just killed someone and that he

was going to kill himself. He explained to her that when he saw L and Jefferson in the stairwell "he just blanked out." The defendant asked his sister to take care of his children. The defendant's sister urged the defendant not to harm himself and instead to turn himself in to the police. She suggested that he contact Officer James Barrett of the Hartford Police Department (police department), with whom the defendant was acquainted. The defendant then drove to Hartford and spoke to Barrett, outside the police department, as his sister had recommended.

The defendant appeared very nervous and distraught when he approached Barrett. He was smoking a cigarette and carrying a small dark duffel bag on his left shoulder when he told Barrett that he had done something wrong and that Barrett should cuff him. As Barrett and another police officer were speaking with the defendant, a BOLO alert[5] was broadcast on the radio describing a suspect who had been involved in a homicide. The defendant heard the alert and said to Barrett, "I told you." Barrett, who also heard the alert, recognized that the defendant fit the description of the suspect and he took the defendant into custody. Shortly thereafter, the defendant experienced a panic attack and was transported from the police department to Hartford Hospital.

When he was taken into custody and before he was transported to the hospital, the defendant left his duffel bag, which was unzipped, on the ground outside the entrance to the police department. Officer Jeffery Valerie could see what appeared to be a firearm and ammunition inside the bag, and he stood by the bag for a few hours until it could be processed. It was later determined that the firearm Valerie observed inside the bag was a Glock.

---

[5] "BOLO stands for be on the look out." (Internal quotation marks omitted.) *State* v. *Williams*, 350 Conn. 363, 366 n.3, 324 A.3d 760 (2024).

The defendant's sister, in the meantime, drove from Massachusetts to Hartford. She spoke with her father, who told her to pick up the vehicle the defendant had left at the police department when he turned himself in. She had the last few digits of the vehicle's license plate. After locating and retrieving the Ford Explorer and driving it off the police department's premises, the defendant's sister observed a photograph of a family she did not recognize and a sheriff's badge in the vehicle, alerting her to the fact that the vehicle did not belong to the defendant and was not a rental car. The defendant's sister believed that the vehicle should not have been in the defendant's possession, contacted Barrett to explain the situation, and returned the Ford Explorer to the police department as Barrett instructed.

The state charged the defendant by way of an amended long form information with one count of murder in violation of § 53a-54a, one count of attempt to commit assault in the first degree in violation of §§ 53a-49 (a) (2) and 53a-59 and one count of larceny in the third degree in violation of General Statutes (Rev. to 2019) § 53a-124. Prior to trial, the defendant filed a notice of his intent to rely on the affirmative defense of extreme emotional disturbance with respect to the murder charge, which, if accepted by the jury, would result in the defendant's conviction of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (2) instead of murder.

At the close of the state's case, the defendant made an oral motion for a judgment of acquittal as to all charges. With respect to the charge of attempt to commit assault in the first degree, the defendant argued that "the only evidence in regard to any possible assault" was L's testimony which, the defendant claimed, was "just not credible." With respect to the charge of larceny in the third degree, the defendant argued that (1) there was no evidence of ownership or

"testimony by an owner saying it's his car and [the defendant] had no right to use it," and (2) there was no proof of intent to permanently deprive the owner of his vehicle. The court denied the motion, and the defendant presented his evidence.

On December 8, 2022, the jury found the defendant guilty of manslaughter in the first degree, attempt to commit assault in the first degree, and larceny in the third degree. The court accepted the jury's verdict. On December 13, 2022, the defendant filed a timely written motion for a judgment of acquittal on the ground of insufficiency of the evidence as to all counts of the amended information. With respect to count two, which charged the defendant with attempt to commit assault in the first degree, the defendant argued that "there is no evidence that there was any ammunition associated with the firearm at the time it was alleged to have been pointed at [L] and neither was there any evidence of a jam or misfire and therefore evidence of any actual intent to cause harm is lacking. He claimed as well that [L's] testimony further proves the firearm [was] incapable of firing at the time she stated that the defendant pulled the trigger." With respect to count three, which charged the defendant with larceny in the third degree, the defendant argued that the state "failed to provide evidence of ownership through evidence of title or testimony of an owner or one in rightful possession of the vehicle" and that "there is no evidence beyond [mere] use of any intent to deprive in that the vehicle was left by the defendant with the keys at the [police department]."

On March 8, 2023, the day of the defendant's sentencing hearing, the court first addressed the defendant's written motion for a judgment of acquittal. Both the prosecutor and defense counsel declined to offer additional arguments and the court denied the defendant's written motion. The court explained, with respect to

the count of attempt to commit assault in the first degree, that "the jury [was] free to credit [L's] testimony and conclude that [the defendant] did point a gun at her head and pull a trigger" and that there was a "legal and factual basis" for the conclusion that an attempt was complete, regardless of why the gun did not fire. With respect to the larceny count, the court relied on the same reasons it gave at the time it denied the defendant's oral motion for a judgment of acquittal, namely, that there was sufficient evidence to support the conclusion that the Ford Explorer did not belong to the defendant. The court thereafter imposed a total effective sentence of fifty years of imprisonment.[6] This appeal followed. Additional facts and procedural history will be set forth as necessary.

## I

The defendant first claims that there was insufficient evidence to convict him of attempt to commit assault in the first degree and larceny in the third degree. Regarding the attempted assault charge, the defendant claims that the state failed to prove beyond a reasonable doubt that he intended to inflict serious physical injury on L. Regarding the larceny charge, the defendant claims that the state failed to prove beyond a reasonable doubt that he (1) *wrongfully* took the Ford Explorer from Roncari and (2) intended to permanently deprive Shavrek of his property. We conclude that the evidence was sufficient to support the jury's verdict on both counts.

We begin our analysis by setting forth the well established standard of review we apply to claims of insufficient evidence. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two

---

[6] The court imposed a sentence of forty years of incarceration, of which five years was a mandatory minimum, for the manslaughter count, a consecutive sentence of ten years for the count of attempt to commit assault, and a sentence of five years for the count of larceny to run concurrently with the sentences for manslaughter and attempt to commit assault.

part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We also note that the [finder of fact] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the [finder of fact] to conclude that a basic fact or an inferred fact is true, the [finder of fact] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Additionally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Lueders*, 225 Conn. App. 612, 623–24, 317 A.3d 69, cert. denied, 349 Conn. 920, 321 A.3d 402 (2024).

## A

We now turn to the defendant's claim that there was insufficient evidence to convict him of attempt to commit assault in the first degree because no reasonable

jury could have concluded beyond a reasonable doubt that he intended to inflict serious physical injury on L. In support of this claim, the defendant argues that to prove his intent to cause L serious physical injury, the state was required to establish that he did more than point his gun at L and that it failed to do so. Focusing on the testimony of the "state's key witness," L, the defendant maintains that she did not actually see him pull the trigger while he was pointing the gun at her face but, rather, *assumed* that he had done so because she heard a click. He posits that L's assumption was impermissible speculation in light of the testimony of the state's firearm expert, Jill Therriault.[7] As such, he argues that "the jury was not free to infer [from L's testimony] that the defendant had pointed a gun at [L] *and* pulled the trigger" and that, consequently, his conviction of attempt to commit assault in the first degree cannot be sustained. (Emphasis in original.) In response, the state contends that it introduced evidence, beyond the defendant's undisputed act of pointing the gun at L's face, to establish the defendant's intent. This evidence included L's testimony that the defendant pulled the trigger, which the state argues the jury was free to credit, as well as the defendant's conduct prior to and immediately following his encounter with L. We agree with the state.

The following additional facts and procedural history are relevant to the defendant's claim. The state called nine witnesses to testify during its case-in-chief. L was the state's fifth witness, and she agreed that she had

---

[7] Therriault was a former supervisor of the firearm and tool mark unit of the state forensic laboratory. She explained that "[a] firearm and tool mark examiner is a forensic scientist who . . . is charged with comparing bullets and cartridge cases that are collected from the crime scenes and their different types of fired evidence. Using a forensic comparison microscope to look at those items . . . and determine whether or not they were fired from a particular firearm."

some degree of familiarity with guns and what it sounds like when a trigger is pulled.[8]

The state's last witness was its firearm expert, Therriault, who had tested the Glock that was found in the defendant's duffel bag and determined that the forty-two shell casings that were collected from the scene of the shooting were fired from that weapon. During cross-examination, defense counsel asked Therriault to "do a little teaching lesson" with the gun, which had been admitted into evidence as an exhibit. She asked Therriault to "hold [the gun] up for the jury . . . [a]nd . . . describe the components."[9] In response, Therriault identified different parts of the gun and explained that "[t]he part that you hold is where a magazine goes. Some people refer to it as a clip, but the correct word is magazine. And the magazine is what holds live cartridges. So, essentially, it's kind of . . . like a box, that is spring-loaded. So, live cartridges would get pushed into that. And that magazine would then get put into the grip of the firearm.

"And so, to fire this gun, you would put the magazine in and push it until it clicks. What you would need to do, then, is pull the slide backwards. It's under spring tension, so . . . you have to pull it . . . backwards. And then as that slide moves forward, it's going to take the top cartridge from the magazine and put it into what's called the chamber of the firearm.

"And so, at that point, this firearm would be ready to fire. So, you would, then, pull the trigger. The firearm would go off."

Defense counsel also asked Therriault if the slide of the gun would remain open if the magazine was empty.

[8] L was licensed to carry firearms. The defendant had purchased a firearm for L, which she knew how to use. L testified at trial that she "used to" own a firearm but that she did not any longer.

[9] At the time of trial, the gun was unloaded and equipped with a safety strap and a zip tie to prevent it from being fired.

After responding in the affirmative, Therriault explained that, "once the magazine is empty, once all of the cartridges have been fired out of it, there is a small, little bottom piece within the magazine that will push up on part of the slide . . . and lock it open." Then, to reload, after releasing the empty magazine, "you would either refill that magazine, or take another magazine that has cartridges in it. Push that into place until it locks into place. And then in the same manner that you did previously, you could pull this [slide] back, let it go . . . . [And] that forward motion would then take the live round of ammunition at the top of the magazine, put it in the chamber, and then this firearm would be ready to shoot again."

Defense counsel then asked Therriault "to talk a little bit about the trigger" and to explain "what a trigger is and . . . how [she] would pull that trigger." After identifying the trigger, Therriault explained that "that's the part of the firearm that you use your finger with to pull that trigger backwards in order to make this gun fire." Therriault further explained that, because the gun was semiautomatic, each time the trigger is pulled, the gun would fire in succession "until there's no more ammunition left." She further explained that the gun did not come with a magazine when it was submitted to the laboratory for testing, but "typically Glock magazines would hold anywhere from . . . fifteen to seventeen" cartridges. Therriault confirmed, however, that there was also a "thirty-three round magazine that would fit in that" particular gun. Therriault was not asked, at any point during her testimony, if there would be a clicking sound associated with pulling the gun's trigger, at *any* time, or under *any* circumstances, and Therriault offered no testimony in this regard.

"Turning to the relevant statutory provisions, § 53a-49 (a) provides in relevant part that [a] person is guilty of an attempt to commit a crime if, acting with the kind

of mental state required for commission of the crime, he . . . (2) intentionally does . . . anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. Section 53a-59 (a) provides in relevant part that [a] person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon. . . .

"Thus, [i]n order to sustain a conviction for attempt to commit assault in the first degree, the state must have presented evidence from which the jury reasonably could have found beyond a reasonable doubt that the defendant did something constituting a substantial step in a course of conduct planned to culminate in his commission of the crime . . . namely, assault with the intent to cause serious physical injury to another person . . . . Regarding the substantial step requirement, we have held that [a] substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime . . . . In order for behavior to be punishable as an attempt, it need not be incompatible with innocence, yet it must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute. . . .

"Regarding the intent requirement, an individual acts intentionally with respect to a result or to conduct . . . when his conscious objective is to cause such result or to engage in such conduct . . . . Intent may be, and usually is, inferred from [a] defendant's verbal or physical conduct [as well as] the surrounding circumstances. . . . Nonetheless, [t]here is no distinction between circumstantial and direct evidence so far as

probative force is concerned. . . . Moreover, [i]t is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . Finally, we underscore that intent [can] be formed instantaneously and [does] not require any specific period of time for thought or premeditation for its formation. . . . Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one." (Internal quotation marks omitted.) *State* v. *Catchings*, 170 Conn. App. 564, 570–71, 155 A.3d 236, cert. denied, 325 Conn. 909, 158 A.3d 319 (2017).

At the outset, we note that, although the defendant's claim is premised on the conclusion that the mere act of pointing a gun at someone is not sufficient to establish intent to inflict serious physical injury beyond a reasonable doubt, this remains an open question in Connecticut that neither our Supreme Court nor this court has addressed squarely. See *State* v. *Carter*, 317 Conn. 845, 857, 120 A.3d 1229 (2015); *State* v. *Catchings*, supra, 170 Conn. App. 569 n.16. In *Carter*, the defendant claimed that the evidence was not sufficient to support his conviction of attempt to commit assault in the first degree because "the mere act of pointing a gun at another person is too equivocal to permit a rational fact finder to find beyond a reasonable doubt that the defendant intended to cause [a person] . . . serious physical injury." (Internal quotation marks omitted.) *State* v. *Carter*, supra, 852. Our Supreme Court expressly declined to address this issue in *Carter*, however, because "there was evidence beyond the mere act of pointing a gun by which the intent element could have been reasonably established." Id., 857.

Specifically, as this court recounted in *Catchings*, there was evidence that the defendant aimed his gun at an area of the victim's body that was "particularly susceptible to substantial physical injury . . . that the

defendant placed his finger on the trigger guard . . . [and], after aiming the gun, [the defendant] positioned himself in a shooting stance and maintained that position for approximately five seconds despite repeated orders [from police officers] to drop the gun . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Catchings*, supra, 170 Conn. App. 572. Moreover, the victim, who was a police officer "was so sure the defendant was going to shoot her that she began to remove the safety mechanism on her own gun. . . . The court also noted that, after the officers closed in on the defendant, he attempted to maintain possession of his gun rather than acquiesce, and that it would not have been unreasonable [given his earlier actions] for the jury to infer that he was attempting to maintain possession of the gun to use it. . . . Finally, the court observed that, approximately one hour before the standoff, the defendant had expressed an intention and willingness to use the gun by threatening to shoot a particular white dude." (Citations omitted; internal quotation marks omitted.) Id.

In *Catchings*, the defendant also claimed that "[t]he simple act of pointing a gun, without any accompanying assertive behavior that could permit an inference of specific intent to seriously injure [the victim] by shooting him, is too equivocal an act to prove intent." (Internal quotation marks omitted.) Id., 568–69. This court concluded, however, after reviewing *Carter*, that there was, in fact, "additional evidence, beyond the defendant's mere act of pointing the gun at [the victim], to establish the defendant's intent, including the defendant's conduct prior to the encounter with [the victim] and the fact that the defendant raised his gun at [the victim] while attempting to resist arrest." Id., 569.

As in *Carter* and *Catchings*, there was additional evidence in the present case beyond the defendant's act of pointing the gun in L's face by which the defendant's

intent to cause L serious physical injury could reasonably have been established. To begin with, L unequivocally testified that the defendant "put the gun to my face . . . [and] [p]ulled the trigger, but nothing happened." Although she did not see the defendant pull the trigger, L testified that she knew he had pulled the trigger because she "heard a click sound." She had also testified that she had some degree of familiarity with guns and what it sounds like when a trigger is pulled.

The defendant acknowledges that, on its face, L's testimony would support an inference that the defendant intended to inflict serious physical injury on L. See, e.g., *State* v. *Turner*, 24 Conn. App. 264, 268, 587 A.2d 1050 (determining that it was reasonable for jury to infer from testimony that defendant pointed "loaded gun at [the victim], pulled the trigger, and that the gun clicked but did not fire" that defendant intended to inflict serious physical injury on victim), cert. denied, 218 Conn. 910, 591 A.2d 812 (1991). But, the defendant argues that "with [L's] and Therriault's testimony properly contextualized, any inference [by the jury] that the 'click' that [L] assumed was the pulling of the trigger, was impermissible speculation" because Therriault only testified about one click—namely, the click associated with loading the gun. The defendant posits that Therriault's testimony in this regard failed to corroborate and, in fact, undermined L's assumption that he had pulled the trigger the first time he held the gun to her face and thus rendered any inference the jury may have drawn from that assumption unreasonable.

Therriault, who testified after L, was not asked to evaluate or respond to L's testimony. Although Therriault did testify that, "to fire this gun, you would put the magazine in and push it until it clicks," she did so as part of her general "teaching lesson" to the jury. Moreover, although Therriault was asked to, and did, "talk a little bit about the trigger," she was not asked

if there would be a clicking sound associated with pulling the gun's trigger, at any time, or under any circumstances, and she offered no testimony in this regard.

Therriault's testimony, therefore, had little, if any, bearing on L's testimony that she knew when she heard a click that the defendant had pulled the trigger while he was pointing the gun at her face. Indeed, Therriault's testimony did not specifically contradict or call into question L's testimony and her version of events,[10] and it certainly did not render L's testimony speculative. At best, Therriault's testimony may have supported a competing inference that the click L heard occurred after the defendant first held the gun to L's face. The jury was not, however, required to draw such an inference as the defendant suggests in his principal appellate brief.

"It is within the province of the jury to draw reasonable and logical inferences from the facts proven." (Internal quotation marks omitted.) *State* v. *Clark*, 56 Conn. App. 108, 112, 741 A.2d 331 (1999). "In conducting our review, we are mindful that the finding of facts, the gauging of witness credibility and the choosing among competing inferences are functions within the exclusive province of the jury, and, therefore, we must afford those determinations great deference." (Internal quotation marks omitted.) *State* v. *Sanchez*, 92 Conn. App. 112, 118, 884 A.2d 1 (2005), appeal dismissed, 282 Conn. 787, 924 A.2d 844 (2007). We conclude that the jury was free to credit L's testimony that the defendant pulled the trigger the first time he first pointed the gun at her face and that the jury could reasonably have inferred from this evidence that the defendant intended to shoot L and cause her serious physical injury. See *State* v. *Turner*, supra, 24 Conn. App. 268.

---

[10] We note, moreover, that "it is not the law that corroboration is essential to the proof of guilt." (Internal quotation marks omitted.) *State* v. *Caballero*, 49 Conn. App. 486, 492, 714 A.2d 1254, cert. denied, 247 Conn. 924, 719 A.2d 1170 (1998).

Moreover, contrary to the defendant's contention that L's testimony regarding the trigger pull was the only evidence from which the jury could infer that he intended to cause her serious physical injury, the defendant's conduct prior to and immediately following his encounter with L also supports such a finding. "It is axiomatic that a factfinder may infer an intent to cause serious physical injury from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately following the incident." (Internal quotation marks omitted.) *State* v. *Commerford*, 30 Conn. App. 26, 34, 618 A.2d 574, cert. denied, 225 Conn. 903, 621 A.2d 285 (1993). The evidence established that the defendant thought that he and L were reuniting and that he was surprised and angry when he saw L and Jefferson together. The evidence further established that before grabbing L, the defendant shot Jefferson multiple times, and that after grabbing L, he continued to shoot Jefferson while holding onto L's hoodie. At some point thereafter, the shooting stopped, the defendant put the gun to L's face, and, as L testified, he pulled the trigger, but nothing happened.[11] The defendant then reloaded the gun and put it back in L's face after doing so. It was only when L asked, "[W]hat about our son?" that the defendant removed the gun from her face, turned it back on Jefferson, and shot him several more times.

On the basis of this evidence, the jury could reasonably have inferred that the defendant realized the magazine was empty because the gun did not fire when he pulled the trigger the first time he held it to L's face,[12]

---

[11] As we have explained previously in this opinion, the jury was free to credit this testimony.

[12] Although the defendant argues in his reply brief that Therriault's testimony also undermined any inference that the reason the gun did not fire when he pointed it at L and pulled the trigger was because the magazine was empty, he also stated expressly in his opening brief to this court that "the evidence indicated that the defendant had pointed his firearm at [L],

that he reloaded the gun in response to that realization, and that he put it back in L's face after doing so with intent to cause her serious physical injury.[13] See, e.g., *State* v. *Catchings*, supra, 170 Conn. App. 571 ("[i]ntent may be, and usually is, inferred from [a] defendant's verbal or physical conduct [as well as] the surrounding circumstances" (internal quotation marks omitted)). That he eventually abandoned his intent "would not negate his earlier intention, and the brevity of that intent is irrelevant." *State* v. *Carter*, supra, 317 Conn. 858. For these reasons, we conclude that the defendant's challenge to the sufficiency of the evidence to support his conviction of attempt to commit assault in the first degree is without merit.

B

Next, the defendant claims that there was insufficient evidence to convict him of larceny in the third degree because no reasonable jury could have concluded beyond a reasonable doubt that (1) his taking of the Ford Explorer was wrongful, and (2) he intended to permanently deprive Shavrek of the vehicle. We disagree.

reloaded, and then continued firing at . . . Jefferson." The jury could reasonably have inferred that there would have been no reason to reload unless the magazine was empty.

[13] We note that the fact that the gun did not fire when the defendant pulled the trigger the first time that he held the gun to L's face does not negate the significance of the trigger pull itself. As we have stated previously in this opinion, "[t]o be guilty of criminal attempt, the defendant need only take a 'substantial step' in a course of conduct planned to culminate in the commission of the crime . . . ." *State* v. *Catchings*, supra, 170 Conn. App. 577. Moreover, "[t]he attempt statute merely requires the state to prove that the defendant took a substantial step 'under the circumstances as he believe[d] them to be . . . .' " Id., 578. Pulling the trigger before the defendant realized the magazine was empty, which is an inference the evidence reasonably supports, was a "substantial step." See, e.g., *State* v. *Carter*, supra, 317 Conn. 858 (placing finger on trigger guard was "one of the last steps that an individual must take before firing a gun").

To convict the defendant of larceny in the third degree, the state bore the burden of proving beyond a reasonable doubt that (1) he committed larceny and (2) the value of the vehicle was ten thousand dollars or less.[14] General Statutes (Rev. to 2019) § 53a-124.[15] "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." General Statutes § 53a-119. "Connecticut courts have interpreted the essential elements of larceny as (1) the wrongful taking or carrying away of the personal property of another; (2) the existence of a felonious intent in the taker to deprive the owner of [the property] permanently; and (3) the lack of consent of the owner. . . . Because larceny is a specific intent crime, the state must show that the defendant acted with the subjective desire or knowledge that his actions constituted stealing. . . . Larceny involves both taking and retaining. The criminal intent involved in larceny relates to both aspects. The taking must be wrongful, that is, without color of right or excuse for the act . . . and without the knowing consent of the owner. . . . The requisite intent for retention is permanency." (Internal quotation marks omitted.) *State* v. *Flowers*, 161 Conn. App. 747, 752, 129 A.3d 157 (2015), cert. denied, 320 Conn. 917, 131 A.3d 1154 (2016).

At the outset, we note that, although the defendant testified at trial that he had no memory of driving from

---

[14] The defendant has not challenged as part of this appeal the sufficiency of the evidence to prove the element of value, and we deem any such claim abandoned. See *JPMorgan Chase Bank, National Assn.* v. *Essaghof*, 221 Conn. App. 475, 485, 302 A.3d 339 ("claims of error not briefed are considered abandoned" (internal quotation marks omitted)), cert. denied, 348 Conn. 923, 304 A.3d 445 (2023).

[15] General Statutes (Rev. to 2019) § 53a-124 (a) provides in relevant part: "A person is guilty of larceny in the third degree when he commits larceny, as defined in section 53a-119, and: (1) The property consists of a motor vehicle, the value of which is ten thousand dollars or less . . . ."

the scene of the shooting to Roncari and taking the Ford Explorer from the lot and driving it to the police department, he does not claim on appeal that the evidence was insufficient to support a finding by the jury that he had done precisely that. In other words, the defendant does not raise an issue with respect to whether and how the taking itself occurred. See *JPMorgan Chase Bank, National Assn.* v. *Essaghof*, 221 Conn. App. 475, 485, 302 A.3d 339 ("claims of error not briefed are considered abandoned" (internal quotation marks omitted)), cert. denied, 348 Conn. 923, 304 A.3d 445 (2023). Rather, the defendant's claim is predicated on the argument that, although he took Shavrek's Ford Explorer from the Roncari lot, the evidence failed to establish that the taking was wrongful and with the intent to be permanent.

1

In support of his argument that there was insufficient evidence that a wrongful taking had occurred, the defendant posits that the state failed to present sufficient evidence (1) as to the rightful owner of the vehicle and (2) that the defendant did not have any right of possession to the vehicle when he took it from the Roncari lot. The evidence at trial, however, established that the 2016 Ford Explorer belonged to Shavrek, who had left the vehicle at the Roncari lot while he traveled to Florida, that Roncari, where the defendant worked as a security guard, was located across the street from Bradley International Airport, and that Shavrek did not know the defendant.[16]

Moreover, the defendant testified that he drove away from the scene of the shooting in his own vehicle, a

---

[16] Although Shavrek did not testify at trial, Detective Daniel Bontempo of the Windsor Locks Police Department spoke with Shavrek as part of his investigation into this matter. Bontempo testified at trial, without objection, about what he and Shavrek discussed.

green Nissan Pathfinder, that he recalls at some point thereafter being at a stop sign in a "different vehicle than my vehicle" and being at the police department after that. The defendant's sister testified that she realized, shortly after driving the Ford Explorer from the police department premises, that the vehicle did not belong to her brother, it was not a rental car, and that it "should not have been in [her] brother's possession." Accordingly, she returned it.

We conclude that the jury reasonably could have found from this evidence that the taking was wrongful. Indeed, "[t]he jury is entitled to draw reasonable inferences from the evidence before it and, in performing its function, the jury brings to bear its common sense and experience of the affairs of life. . . . It is often said that common sense is not left at the courthouse door." (Citation omitted; internal quotation marks omitted). *State* v. *Flowers*, supra, 161 Conn. App. 757. In this case, the jury could reasonably have inferred that Shavrek, to whom the vehicle belonged, was the owner of the vehicle; see General Statutes § 53a-118 (a) (5) ("[a]n 'owner' means any person who has a right to possession superior to that of a taker, obtainer or withholder"); and that he entrusted it to Roncari while he traveled to Florida with the expectation that the vehicle would remain parked at the lot until he returned. This is common practice for many airport travelers. Moreover, particularly because Shavrek was in Florida at the time of the taking and he did not know the defendant, it would have been reasonable for the jury to infer that the defendant did not have Shavrek's "knowing consent" to take his vehicle, let alone to use it, in place of the defendant's own vehicle, in the course of the defendant's flight from the scene of the shooting. In other words, there was sufficient evidence from which the jury could reasonably find that the taking occurred "without color of right or excuse for the act . . . and

without the knowing consent of the owner." (Internal quotation marks omitted.) *State* v. *Flowers*, supra, 752.

2

In advancing his argument that the evidence was insufficient to support a finding that the defendant intended to permanently deprive Shavrek of his vehicle, the defendant contends that "[i]t logically does not follow that, if the requisite intent for retention is permanency . . . but [the defendant] returned such property when turning himself [in to] the police . . . that he had intended to permanently deprive the owner of [his] property." The defendant emphasizes, in this regard, that he returned the vehicle on "the same day [he took it], without any evidence being presented that the vehicle had been damaged, and thus depriving the owner of the vehicle's economic value. He returned the vehicle *to the police*, therefore, the return was done in such a fashion as to allow the recovery of the vehicle with near certainty." (Emphasis in original.) In other words, the defendant claims that he could not be convicted of larceny because he did not keep the Ford Explorer.

In addressing this claim, we are guided by this court's decision in *State* v. *Spells*, 76 Conn. App. 67, 90–91, 818 A.2d 808, cert. denied, 266 Conn. 901, 832 A.2d 67 (2003), wherein a similar claim was made. Specifically, the defendant in *Spells* claimed that he could not have been convicted of robbery because he did not keep the property he had stolen from the victim. Id., 90. This court deemed the defendant's claim "misguided because the defendant misapprehends the intent necessary to commit robbery" and concluded that our Supreme Court's holding in *State* v. *Anderson*, 212 Conn. 31, 561 A.2d 897 (1989), was controlling. *State* v. *Spells*, supra, 90. The same is true in the present case.[17] In *Spells*, we

---

[17] Although *Anderson* involved a defendant's challenge to the sufficiency of the evidence to sustain his conviction of robbery in the first degree, "[l]arceny is a lesser included offense and therefore a required element of the crime of robbery . . . ." *State* v. *Sam*, 98 Conn. App. 13, 35, 907 A.2d

explained that, "[i]n *Anderson*, the defendant had used a knife to rob the victim, but moments after he took the money, he returned it to her. On appeal, the defendant claimed that he did not have the intent necessary to deprive the victim of her money because he returned it. . . .

"In discussing the intent to deprive another of property . . . [our Supreme Court has] stated that the accused must *intend* both to take the property of another and to retain it. . . . The requisite intent for retention is permanency. . . . [S]ee General Statutes § 53a-118 (a) (3) (deprive means withhold [property] or cause it to be withheld from [the victim] permanently. . .). Intent, however, can be inferred both from the defendant's conduct and his statements *at the time of the crime* . . . and whether such an inference should be drawn is properly a question for the jury to decide. . . . To be convicted of [larceny in the third degree], therefore, it is not necessary for the jury to find that the defendant actually kept the property in question, but rather, that at the moment he took the property he intended to retain it permanently. . . . Moreover, a postoffense change of heart is not a defense to a crime." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Spells*, supra, 76 Conn. App. 90–91.

On the basis of the evidence, which we have reviewed in the light most favorable to sustaining the verdict, we determine that the jury reasonably could have found

99, cert. denied, 280 Conn. 944, 912 A.2d 478 (2006); see also General Statutes § 53a-133 ("[a] person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) [p]reventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny").

that when the defendant took Shavrek's vehicle, it was with the intent to retain it permanently. In light of the foregoing, we conclude that the evidence demonstrated beyond a reasonable doubt that the defendant committed larceny in the third degree.

## II

Next, the defendant claims that he was deprived of his right to a fair trial as a result of prosecutorial impropriety. Specifically, he argues that the prosecutor improperly (1) asked the defendant, during cross-examination, to opine on the veracity of L and thereafter made use of his response during his rebuttal argument to the jury, (2) relied on L's speculative testimony that the defendant had pulled the trigger when holding the gun to her face during his closing argument to the jury, and then relied on facts not in evidence to explain why the gun did not fire, and (3) aligned himself with, and appealed to the emotions of, the jurors during his closing and rebuttal arguments. The state asserts that, when considered in context, the prosecutor's cross-examination of the defendant and comments to the jury during closing and rebuttal arguments were proper, and that, even if they were improper, they nevertheless did not prejudice the defendant so as to undermine the fairness of his trial. Although we agree that certain questions the prosecutor posed while cross-examining the defendant were improper, that the prosecutor should not have relied on the defendant's responses to those improper questions during his rebuttal argument, and that the prosecutor improperly relied on facts not in evidence during his closing argument, we conclude that, under the circumstances of this case, these improprieties do not constitute grounds for reversal on the basis of the deprivation of the right to a fair trial.

Before we address the merits of the defendant's claims, we set forth the standard of review and the law

governing the claims of prosecutorial impropriety. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[O]ur determination of whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include: [1] the extent to which the [impropriety] was invited by defense conduct or argument . . . [2] the severity of the [impropriety] . . . [3] the frequency of the [impropriety] . . . [4] the centrality of the [impropriety] to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . and [6] the strength of the state's case. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . Under the *Williams* general due process standard, the defendant has the burden to show both that the prosecutor's conduct was improper and that it caused prejudice to his defense. . . . The two steps of [our] analysis are separate and distinct, and we may reject the claim if we conclude [that] the defendant has failed to establish either prong. . . .

"Because [some of] the claimed prosecutorial improprieties occurred during [both closing and] rebuttal closing argument, we also set forth the following legal principles. It is well established that prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however, counsel] must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence [on] jurors. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters [that] the jury ha[s] no right to consider. . . .

"Lastly, we note that defense counsel did not object to any of the [alleged improprieties at trial]. [O]ur Supreme Court has explained that a defendant's failure to object at trial to each of the occurrences that he now raises as instances of prosecutorial impropriety, though relevant to our inquiry, is not fatal to review of his claims. . . . This does not mean, however, that the absence of

an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. . . . To the contrary, we continue to adhere to the well established maxim that defense counsel's failure to object to the [alleged improprieties at the time they occurred] suggests that defense counsel did not believe that [they were] [improper] in light of the record of the case at the time."[18] (Citations omitted; internal quotation marks omitted.) *State* v. *Maurice B.*, 228 Conn. App. 720, 726–29, 324 A.3d 850, cert. denied, 350 Conn. 929, 326 A.3d 249 (2024). We proceed with our review of the defendant's claims with these principles in mind.

## A

We turn first to the defendant's contention that the prosecutor improperly asked him, during cross-examination, to comment on the veracity of L and thereafter made use of the defendant's response during his rebuttal argument. The following additional procedural history is relevant.

As we have previously noted, the defendant testified that he did not remember shooting Jefferson or much about the shooting incident itself. To this end, although he acknowledged during cross-examination that he was aware that L "stated that [he] put the gun to her face and pulled the trigger," he testified that he did not remember doing so. Moreover, he further testified that he could "honestly say that [he] did not do that to [L] . . . because [he knew he] wouldn't." Shortly thereafter, the following colloquy between the prosecutor and the defendant took place:

---

[18] "[U]nder settled law, a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) *State* v. *Maurice B.*, 228 Conn. App. 720, 729 n.12, 324 A.3d 850, cert. denied, 350 Conn. 929, 326 A.3d 249 (2024).

"[The Prosecutor]: [Y]ou heard [L]. I mean, do you . . . think she's not being truthful as to what happened?

"[The Defendant]: Yes.

"[The Prosecutor]: You . . . think she's not being truthful?

"[The Defendant]: Yes.

"[The Prosecutor]: Okay. So, you think that she's making up what she had said happened?

"[The Defendant]: She's making up some of that story. Yeah."

Defense counsel did not object to this line of questioning and during his closing argument to the jury, he argued as follows:

"You heard [L's] testimony. [The defendant] started shooting. He didn't say anything. He just kept shooting and shooting and shooting. She said it was so fast. She said, at one point, [he] stopped and pointed a gun at her. Did he? I don't know. That's her testimony. What did she believe? Did she reconstruct her memory? I don't know. We weren't there. [The defendant] called her a liar. Did he call her a liar because she was lying, or because he couldn't believe that he would've ever pointed a gun at her?"

Thereafter, during the state's rebuttal closing argument, when addressing the defendant's lack of recall with respect to the shooting and many of the events that followed, the prosecutor argued: "And again, [the defendant] doesn't remember pulling the trigger on [L].

"In fact, he went as far as to say that [L] must not be telling the truth. That's his explanation for her stating that he, in fact, did put the gun to her face. Not once, but twice, if you recall. And, as I stated earlier, this was a traumatic experience for everyone involved. However,

[L] seems to have quite the clear memory of that morning and all the events preceding that particular moment as well as afterwards and during." Defense counsel did not object to this argument.

Relying primarily on *State* v. *Singh*, 259 Conn. 693, 706, 793 A.2d 226 (2002), the defendant argues that the state improperly "elicited testimony that the defendant believed that [L], a sympathetic witness, was lying to the jury, and then emphasized that point during its rebuttal."[19] "In *Singh*, the prosecutor compelled the defendant to comment on the veracity of other witnesses' testimony and emphasized the defendant's response during closing argument. . . . Our Supreme Court adopted the rule that 'it is improper to ask a witness to comment on another witness' veracity.' " (Citation omitted.) *State* v. *Singleton*, 95 Conn. App. 492, 498, 897 A.2d 636, cert. denied, 279 Conn. 904, 901 A.2d 1228 (2006).

Our Supreme Court also held in *Singh* "that it is improper for a prosecutor essentially to argue during closing that, in order to find the defendant not guilty, the jury must find that witnesses had lied . . . . [Our Supreme Court] explained that [t]he reason for this restriction is that [t]his form of argument . . . involves a distortion of the government's burden of proof and preclude[s] the possibility that the witness' testimony conflicts with that of the defendant for a reason other than deceit. . . . [Our Supreme Court] later held, in

---

[19] The defendant also posits that "[e]liciting and then highlighting [the defendant's] comments on [L's] veracity served no purpose other than to enflame the [jurors'] passions." He offers no analysis or citation to authority with respect to this contention, however, and thus it is inadequately briefed. See *State ex rel. Dunn* v. *Burton*, 229 Conn. App. 267, 304, 327 A.3d 982 (2024) ("Claims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . ." (Internal quotation marks omitted.)).

*State* v. *Albino*, 312 Conn. 763, 97 A.3d 478 (2014), that, in closing argument, there is a distinction between characterizing a witness' testimony as a lie and characterizing it simply as wrong. [W]hen the prosecutor argues that the jury must conclude that one of two versions of directly conflicting testimony must be wrong, the state is leaving it to the jury to make that assessment [of the witness' veracity]. . . . [B]y framing the argument in such a manner, the jury is free to conclude that the conflict exists due to mistake (misperception or misrecollection) or deliberate fabrication. . . . Nonetheless, the mere use of the term wrong instead of lying will not always be proper if the prosecutor's closing arguments provid[e], *in essence*, that in order to find the defendant not guilty, the jury must find that witnesses had lied . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Diaz*, 348 Conn. 750, 771–72, 311 A.3d 714 (2024).

In the present case, the prosecutor violated the first rule articulated in *Singh* by asking the defendant, twice, whether he thought that L was not being truthful and also whether he thought she was "making up" her version of events. We conclude therefore, that these questions were improper. See, e.g., *State* v. *Warholic*, 278 Conn. 354, 383, 897 A.2d 569 (2006) (prosecutor's question to defendant during cross-examination regarding whether he had stated that child complainant made up allegations of sexual assault was improper); *State* v. *Singleton*, supra, 95 Conn. App. 498 (prosecutor's questions to defendant during cross-examination about whether state's witnesses had lied or were wrong were improper).

For this reason, we also agree with the defendant's claim that the reference the prosecutor made during his rebuttal closing argument about the testimony the

defendant gave in response to these improper questions, namely, that the defendant "went as far as to say that [L] must not be telling the truth," also ran afoul of our Supreme Court's holding in *Singh*. Although it is true that this assertion by the prosecutor followed and responded to defense counsel's closing argument in which defense counsel reiterated the defendant's response to the questions about which the defendant now complains; see, e.g., *State* v. *Pernell*, 194 Conn. App. 394, 410, 221 A.3d 457 ("[t]he state may properly respond to inferences raised by the defendant's closing argument" (internal quotation marks omitted)), cert. denied, 334 Conn. 910, 221 A.3d 44 (2019); *State* v. *Mucha*, 137 Conn. App. 173, 193, 47 A.3d 931 ("[i]t is not improper for a prosecutor appropriately to respond to statements made by defense counsel during the defendant's closing argument"), cert. denied, 307 Conn. 912, 53 A.3d 998 (2012); under the circumstances of this case, where the questions themselves were improper and the responses should not have been before the jury, the prosecutor's reference to the responses the improper questions elicited was inappropriate as well. See, e.g., *State* v. *Salamon*, 287 Conn. 509, 565, 949 A.2d 1092 (2008) ("it is improper for a prosecutor, in his closing argument, to refer to evidence that has been stricken or ruled inadmissible"). We thus conclude that the prosecutor's reference to the defendant's testimony that "[L] must not be telling the truth" during his rebuttal closing argument was improper.

B

Next, we address the defendant's claim that, during his closing argument, the prosecutor improperly relied on L's speculative testimony when he argued that the defendant had pulled the trigger while holding the gun to L's face and that he improperly introduced facts outside of the record to explain why the gun did not fire. Although the defendant did not object to these

remarks at trial, he posits on appeal that it was improper for the prosecutor to argue that the defendant's gun had "jammed or misfired because that fact was neither in evidence nor a reasonable inference" that could have been drawn therefrom. The state responds that "[t]he prosecutor's remark that the gun 'jammed or misfired' constituted fair argument when considered in context." We agree with the defendant that the prosecutor's argument that the gun had "jammed or misfired" was improper.

The following additional procedural history is relevant. As stated previously in this opinion, the state's expert, Therriault, performed testing on the gun. This included test firing, which Therriault testified allowed her to determine, inter alia, whether the gun was functioning properly. To this end, Therriault determined that the gun was "operable." Therriault was not asked, and offered no testimony about, whether the gun may have either jammed or misfired. Indeed, there was no evidence in this regard. Even so, during his closing argument, when describing what happened when the defendant encountered Jefferson and L in the stairwell, the prosecutor stated that the defendant, "under the belief that he came upon some situation, one which he was unable to articulate, pulled out a gun and fired an unknown amount of times at . . . Jefferson as he was exiting the building. He then turned the gun on [L]. He pulled the trigger. The gun either jammed or misfired. After [L] essentially begged for her life and asked what about the son that they share, [the defendant] then turned the gun back on . . . Jefferson and continued to shoot him."

"A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument. . . . [Moreover] [a] prosecutor may

invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence.” (Citation omitted; internal quotation marks omitted.) *State* v. *Fasanelli*, 163 Conn. App. 170, 188–89, 133 A.3d 921 (2016). “[W]hen a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury.” (Internal quotation marks omitted.) *Valentine* v. *Commissioner of Correction*, 219 Conn. App. 276, 322, 295 A.3d 973, cert. denied, 348 Conn. 913, 303 A.3d 602 (2023).

At the outset, we have already concluded, in part I A of this opinion, that L’s testimony that the defendant pulled the trigger of the gun the first time he was pointing it at her face was not speculative and that the jury was free to credit her testimony in this regard. It was equally appropriate for the prosecutor to rely on that testimony when he argued that the defendant had pulled the trigger, and we reject the defendant’s argument to the contrary.

It was not appropriate, however, for the prosecutor to argue that “[t]he gun either jammed or misfired” after the defendant pulled the trigger because there was no direct evidence that this occurred, nor was there evidence from which the jury may have reasonably inferred that this occurred. L expressly testified that she did not know why the weapon did not fire, and Therriault confirmed that the gun was “operable.” The evidence in this case was that the defendant pulled the trigger, the gun did not fire, and the defendant reloaded thereafter. Although it would have been reasonable to infer from this evidence that the gun did not fire because it was empty; see part I A of this opinion; there is simply no basis for an inference that the “operable” gun did not fire because it either “jammed or misfired.” As such, the prosecutor’s statement to the jury in his closing

argument that this had occurred was speculative and, thus, improper. See *Valentine* v. *Commissioner of Correction*, supra, 219 Conn. App. 322.

C

Finally, we address the defendant's claim that the prosecutor improperly aligned himself with, and appealed to the emotions of, the jurors during his closing and rebuttal arguments to the jury. Specifically, the defendant argues that the prosecutor "improperly made use of 'we' and ['us'] statements to align [himself] with the jur[ors], distort their fact-finding mission, and appeal to their emotions." He claims that the following statements were improper:

" '[W]e know that [L] went and picked up . . . Jefferson.' . . .

" '[W]e know that [the defendant] called his sister.' . . .

" 'Let's look at this from a basic standpoint.' . . .

" 'Let's talk about some of the witnesses that you heard from.' . . .

" '[W]e do have an eyewitness who can fill in the gaps for where [the defendant] seems to have forgotten.' . . .

" 'If you recall, [the defendant] told us here in the courtroom that [he] did not want to become a police officer because the idea of shooting another person is too much for him to handle.' . . .

[And] " '[*l*]*et's* not excuse away [the defendant's] conduct. Again, I'd ask you to use common sense here. Use logic. Use reasoning. I'd ask for a finding of guilty on all charges' . . . ." (Emphasis in original.)

Although the defendant did not object to these remarks, or any portion of the prosecutor's closing and

rebuttal arguments, at trial, he argues on appeal that the " 'we' and 'us' statements improperly aligned the state as a member of the jury" and that the final "we" and "us" statement was also improper "because it signaled to the jury that, notwithstanding the state's burden to prove [its] case beyond a reasonable doubt and [the defendant's] presumption of innocence until proven otherwise, any verdict other than a guilty one would 'excuse' his conduct" and amounted to an inappropriate "duty to convict" argument. We disagree with the defendant. On the basis of our review of the challenged remarks, we do not find any of them to be improper.

"Although [w]e repeatedly have emphasized that counsel, and especially prosecutors, must be particularly careful to avoid the unnecessary use of the first person . . . we also have recognized that comments of the type at issue here represent the kind of lapse that sometimes occurs, without premeditation, in the heat of the moment and at the close of an emotional trial. . . . Thus, isolated comments of this type generally do not give rise to a due process violation or otherwise result in manifest injustice because a properly instructed jury is likely to appreciate fully its duty to decide the case on the evidence and not on the basis of such rhetoric." (Citations omitted; internal quotation marks omitted.) *State* v. *Ancona*, 270 Conn. 568, 608–609, 854 A.2d 718 (2004), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005); see also *State* v. *Gibson*, 302 Conn. 653, 660, 31 A.3d 346 (2011) ("we recognize that the use of the word I is part of our everyday parlance and . . . because of established speech patterns, it cannot always easily be eliminated completely from extemporaneous elocution"). Moreover, "[c]losing arguments of counsel are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning

less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (Internal quotation marks omitted.) *State* v. *Mendoza*, 49 Conn. App. 323, 327, 714 A.2d 1250, cert. denied, 247 Conn. 903, 720 A.2d 516 (1998).

In the present case, the prosecutor's use of the first person was limited, and the jury was properly instructed as to its exclusive role as the fact finder, as distinguished from the attorneys' role in presenting their arguments. As such, we deem the few instances about which the defendant complains insignificant and conclude that they did not rise to the level of misconduct. See *State* v. *Ancona*, supra, 270 Conn. 609.

The defendant also argues that the final "we" and "us" comment about which he complains "signaled to the jury that, notwithstanding the state's burden to prove [its] case beyond a reasonable doubt and [the defendant's] presumption of innocence until proven otherwise, any verdict other than a guilty one would 'excuse' his conduct" and amounted to an inappropriate "duty to convict" argument. We disagree.

The following additional procedural history is relevant. At the beginning of his initial closing statement, the prosecutor asked the jury to "[b]e logical. Use common sense" in the course of its deliberations. Thereafter, in concluding his rebuttal argument, the prosecutor summarized the defendant's conduct, which he argued "show[ed] what his intent was." The prosecutor stated: "Again, F this. The shooting itself. Pulling out the gun. Shooting. Putting the gun into [L's] face. Then shooting again. Reloading in that process. The switching

of cars to avoid detection. He demanded [L's] car. And then he went and took another vehicle. And yes, he did, in fact, turn himself in at some point in time. However, his conduct right after suggests he was very conscious of what was going on. And he was attempting to evade any detection.

"Let's not excuse away [the defendant's] conduct. Again, I'd ask you to use common sense here. Use logic. Use reasoning. I'd ask for a finding of guilty on all the charges . . . ."

It is the single sentence "[l]et's not excuse away [the defendant's] conduct" that forms the basis of the defendant's argument. "When reviewing a claim of prosecutorial impropriety, [however] we do not scrutinize each individual comment in a vacuum but, rather, review the comments complained of in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 45, 917 A.2d 978 (2007). The statement on which the defendant focuses was made at the conclusion of the prosecutor's final remarks to the jury, after he recounted the evidence related to the defendant's conduct. Moreover, it followed the prosecutor's initial request, and preceded his restated request, that the jury use logic and common sense in assessing the evidence and reaching its verdict.

"[I]n deciding cases . . . [j]urors are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion." (Internal quotation marks omitted.) *State* v. *O'Brien-Veader*, 318 Conn. 514, 547, 122 A.3d 555 (2015). Therefore, it is entirely appropriate for a prosecutor to "appeal to [the jurors'] common sense in closing remarks, so long as the prosecutor's arguments are based on evidence presented at trial and

reasonable inferences that jurors might draw there-from." (Internal quotation marks omitted.) *State* v. *Courtney G.*, 339 Conn. 328, 347–48, 260 A.3d 1152 (2021). It was therefore appropriate for the prosecutor to appeal to the jury as he did, and we conclude that when he asked that the jury "not excuse away [the defendant's] conduct," he was simply reiterating his request that the jury use its common sense in deciding the facts.

For these reasons, we conclude that the foregoing statements, made during the course of the prosecutor's opening and rebuttal closing arguments, were not improper.

D

Having determined that (1) the questions the prosecutor asked the defendant during cross-examination regarding L's veracity, and his reliance on the defendant's responses thereto, were improper, and (2) the prosecutor improperly relied on facts not in evidence when he argued during closing argument that the gun "either jammed or misfired," we now turn to an analysis of whether, under the *Williams* factors, these improprieties, either individually or cumulatively, deprived the defendant of a fair trial. See *State* v. *Dabate*, 351 Conn. 428, 437, 331 A.3d 1159 (2025). "The defendant bears the burden of demonstrating that, when considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process. . . . [O]ur determination of whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [supra, 204 Conn. 540], with due consideration of whether that [impropriety] was objected to at trial. . . . Those factors include the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . .

the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . . Ultimately, [t]he issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Citations omitted; internal quotation marks omitted.) *State* v. *Courtney G.*, supra, 339 Conn. 361–62. We conclude, on the basis of our examination of each factor, that the improprieties the prosecutor committed in the present case did not impermissibly infringe on the defendant's due process rights such that he was deprived of a fair trial. See *State* v. *Maurice B.*, supra, 228 Conn. App. 744.

At the outset, we note that the state has not argued that any of the misconduct was invited by defense counsel's conduct or argument and, in fact, posits that "the defendant may not have invited" the improprieties. As such, this factor weighs in favor of the defendant. The remaining factors, however, weigh in favor of the state.

With respect to the severity of the improprieties, the prosecutor asked the three short, improper, questions, in back-to-back succession, toward the end of his cross-examination of the defendant. See *State* v. *Dabate*, supra, 351 Conn. 437. Although the questions were not invited by defense counsel's conduct or argument, they did follow and relate to the defendant's testimony that, although he did not remember much about the shooting and events related thereto, he did not hold the gun to L's face because he knew he would not do something like that. Moreover, the prosecutor did not belabor the point after asking the questions and securing the defendant's response and he did not address the defendant's testimony regarding L's veracity during his initial closing argument. See, e.g., *State* v. *Pernell*, supra, 194 Conn. App. 410. Although the prosecutor did improperly revisit the defendant's testimony during his rebuttal

closing argument, he did so in response to defendant's counsel's having done so in his closing argument. See id. Finally, the prosecutor's comment, though improper, about the gun having jammed or misfired simply served as an explanation for why nothing happened when the defendant pulled the trigger. The trigger pull itself was the critical issue, and the jury had before it evidence from which it could have properly inferred that the gun did not fire because the magazine was empty. As such, these improprieties were not a pervasive characteristic of the entire trial.

In addition, defense counsel did not object to the prosecutor's questions, or to his closing and rebuttal closing arguments, which in and of itself "suggests that [he] did not believe that [they were] [improper] in light of the record of the case at the time." (Internal quotation marks omitted.) *State* v. *Maurice B.*, supra, 228 Conn. App. 729. And, because the defendant did not object to the prosecutor's questions and arguments, the court did not take any curative measures. See *State* v. *Santiago*, 269 Conn. 726, 762, 850 A.2d 199 (2004) ("the defendant, by failing to bring them to the attention of the trial court, bears much of the responsibility for the fact that [the] claimed improprieties went uncured" (internal quotation marks omitted)).

We note, nonetheless, that defense counsel directly addressed the defendant's responses to the prosecutor's improper questions during redirect examination of the defendant as follows:

"[Defense Counsel]: When you say that you don't believe that [L] was being entirely truthful, is that because you remember what went on?

"[The Defendant]: No.

"[Defense Counsel]: Why don't you believe she was being truthful?

"[The Defendant]: In her testimony, a couple of things that stuck out. She said she was talking to [Jefferson] and all this. And she's said on the record when she was talking to the victim, she was never talking to me. And later on, she changed it, like, oh yeah. Well, I was talking to [the defendant] basically up until that happened. So, if she was lying about something like that, what about the other little parts.

"[Defense Counsel]: Yes, but we're specifically talking about what the state's attorney is questioning you about. On October 22nd . . . you saw the evidence of the shooting?

"[The Defendant]: Yes.

"[Defense Counsel]: I showed you the state's exhibit 23. Do you believe it did not happen?

"[The Defendant]: I know it happened. I'm here."

As such, defense counsel was able to have the defendant clarify, during redirect examination, that he disagreed with L's testimony and thought she was being untruthful regarding the status of her relationships with him and with Jefferson, but that he knew that the shooting and the events related thereto, as relayed by L, occurred. In other words, the answers elicited by the improper questions did not pertain to the entirety of L's testimony or the central issues in the case. It is true that L was the only eyewitness to the shooting and that her testimony and credibility were critical to the prosecution's case. The fact remains, however, that, notwithstanding the improper questions and responses they garnered, the jury remained free to reject or credit her testimony and, thus, any impact the questions and responses may have had was minimal. See *State* v. *Courtney G.*, supra, 339 Conn. 365.

Finally, we observe that the state's case was strong. The state presented persuasive testimonial evidence,

in addition to that of L, concerning the defendant's conduct. See *State* v. *Flowers*, supra, 161 Conn. App. 769. For example, the defendant's sister and Barrett testified about the defendant's demeanor and state of mind immediately after the shooting. The defendant's sister and Detective Daniel Bontempo of the Windsor Locks Police Department testified about Shavrek's vehicle, which the defendant had taken from the Roncari lot and, although the defendant could not remember much about the shooting, and could not believe that it happened, he testified that he knew that it did. In light of the foregoing, we conclude that the improprieties committed by the prosecutor during his cross-examination of the defendant and his closing and rebuttal closing arguments were minor and unimpactful and did not implicate the fairness of the trial.

The judgment is affirmed.

In this opinion the other judges concurred.